**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>ALEXANDER BERNARD KASPAR,<br><br>               Debtor. | **FOR PUBLICATION**<br><br>Chapter 7<br><br>Case No. 22-10382 (MG) |
| MARIANNE T. O'TOOLE, solely in her capacity as Chapter 7 Trustee of the Estate of Alexander Bernard Kaspar,<br><br>               Plaintiff,<br><br>        v.<br><br>M. CABRERA & ASSOCIATES, P.C., MATTHEW M. CABRERA, ESQ., ALEXANDER BERNARD KASPAR, CITYGRACE CORP. a/k/a CITIGRACE CORP, GRACE A. DELIBERO, a/k/a GRACE ANGELA DELIBERO, JOHN DOE "1" THROUGH "100", JANE DOE "1" THROUGH "100", JOHN DOE CORPORATIONS "1" THROUGH "100" AND OTHER JOHN DOE ENTITIES "1" THROUGH "100",<br><br>               Defendants. | Adv. Pro. Case<br>No. 23-01154 (MG) |

## MEMORANDUM OPINION ON SUMMARY JUDGMENT MOTIONS

*A P P E A R A N C E S:*

LAMONICA HERBST & MANISCALO, LLP
*Counsel to Marianne T. O'Toole, as Trustee*
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
By:    Holly R. Holecek, Esq.

ABRAMS GARFINKEL MARGOLIS BERGSON, LLP
*Counsel to M. Cabrera & Associates, P.C. and Matthew M. Cabrera, Esq.*
1430 Broadway, 17th Floor
New York, New York 10018
By:    Robert J. Bergson, Esq.
         Andrew W. Gefell, Esq.

LAW OFFICE OF CHARLES A. HIGGS
*Counsel to Alexander Bernard Kaspar*
2 Depot Plaza, Ste. 4
Bedford Hills, NY 10507
By:    Charles A. Higgs, Esq.

BRONSON LAW OFFICES, PC
*Counsel to CityGrace Corp. and Grace A. DeLibero*
480 Mamaroneck Avenue
Harrison, NY 10528
By:    H. Bruce Bronson, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding stems from a blatant violation of a sale order entered in

Alexander Bernard Kaspar's ("Kaspar" or the "Debtor") prior bankruptcy (Case No. 18-36862).

That Chapter 11 proceeding culminated in an order ("Sale Order") allowing a free-and-clear sale

of one of the Debtor's pieces of land for nearly $800,000 (ECF Doc. # 292, Case No. 18-36862),

followed soon thereafter by the voluntary dismissal of that case.  Among the terms of the Sale

Order was a requirement that the Debtor set aside $400,000 of the proceeds in escrow for use for

environmental remediation of a different piece of property (the "Cimarron Ranch").  The money

was to be held by the Debtor's former counsel and a co-defendant in this action, Matthew

Cabrera ("Cabrera"), and his law firm M. Cabrera & Associates, P.C. ("Firm"), until such time

as the New York State Department of Environmental Conservation ("DEC") approved a

remediation plan submitted by the Debtor.  If and only if that condition occurred, the $400,000 in

escrow with Cabrera would be doled out into the Debtor's DIP account (from his first

2

bankruptcy) for use for remediation *only*, until the remediation was fully paid for.  The Debtor and his longtime significant other, Grace DeLibero ("DeLibero"), would have a reversionary interest in whatever of the $400,000 may remain thereafter.  The Sale Order clearly states that it is binding and survives the dismissal of Kaspar's first Chapter 11 case.

Instead of following the clear terms of the Sale Order, Cabrera disbursed the entire $400,000 in escrow to himself and his firm, DeLibero, and Kaspar.  This Court has already held that, in so doing, Cabrera and Kaspar violated the Sale Order.  (ECF Doc. # 94, Case No. 22-10382).  At most, six thousand dollars *may have been spent* on remediation—1.5% of the amount allocated, if the Court is to be generous to the defendants.  The rest was spent, as Cabrera flippantly puts it, "to live."  (ECF Doc. # 36 at 14.)

Kaspar subsequently filed another Chapter 11 case (Case No. 22-10382), which this Court converted to a Chapter 7 upon finding that he and Cabrera violated the Sale Order.  Marianne O'Toole ("O'Toole" or the "Trustee") was appointed as the Chapter 7 Trustee in this case.

The complaint in this action ("Complaint," ECF Doc. # 1) represents O'Toole's attempts to force Cabrera, Kaspar, and DeLibero to hand back the $400,000 they illicitly split amongst themselves.  O'Toole presents numerous theories of liability, each of which is discussed in detail below.  DeLibero has also filed crossclaims against Cabrera, which are also at issue, as Cabrera seeks to have them dismissed.

Nearly every party in the case has moved for partial or full summary judgment in their favor: Cabrera and his law firm (together, "Cabrera") ("Cabrera SJ," ECF Doc. # 36)[1], O'Toole

---

[1]      Cabrera attaches a number of exhibits to his motion: the Complaint (Ex. A); Cabrera's answer to the Complaint (Ex. B); DeLibero's answer with crossclaims against Cabrera (Ex. C); Kaspar's answer to the Complaint (Ex. D); Cabrera's answer to DeLibero's crossclaims (Ex. E); the transcript of the pre-trial deposition of Alexander

as Chapter 7 Trustee for the Debtor ("O'Toole SJ," ECF Doc. ## 37,[2] 38), and DeLibero and her

company CityGrace Corp. ("CityGrace" and together, "DeLibero") (ECF Doc. # 39, 40).

---

Bernard Kaspar ("Kaspar Dep. Tr.," Ex. F); the transcript of the pre-trial deposition of Grace DeLibero ("DeLibero Dep. Tr.," Ex. G); an affidavit filed by Kaspar in his prior bankruptcy case (Ex. H); a proposed agreement between Environmental Consulting & Management Services Inc. ("ECMS") and Kaspar (Ex. I); Kaspar's motion for an order approving the sale of the Property, filed by Cabrera in Kaspar's previous Chapter 11 case, and including the draft Sale Order (Ex. J); DeLibero's declaration in support of the motion for entry of a sale order in Kaspar's prior Chapter 11 (Ex. K); a letter from the New York State Department of Environmental Conservation ("DEC"), dated November 16, 2021, concerning a proposed remediation plan for Cimarron Ranch (Ex. L); the Sale Order in Kaspar's previous Chapter 11 (Ex. M); the closing statement from the sale of the Property (Ex. N); an affidavit filed by DeLibero in Kaspar's current bankruptcy proceeding (Ex. O); emails between Cabrera and DeLibero sent on February 3, 2022 (Ex. P); a letter from ECMS to Kaspar, dated March 1, 2023, concerning the cost of remediation (Ex. Q); emails between Cabrera and Kaspar dating from February 3–4, 2022 (Ex. R); an order from Kaspar's prior bankruptcy proceeding granting Cabrera's applications for interim compensation (Ex. S); emails between Cabrera and Kaspar dating from February 3–4, 2022 (Ex. T); emails between Cabrera and Kaspar dating from February 3–7, 2022 (Ex. U); an order from Kaspar's current bankruptcy authorizing the retention of ECMS (Ex. V); a statement of material facts; and an affidavit in support of his motion ("Cabrera Affidavit" or "Cabrera Aff.").

[2]     O'Toole attaches a number of exhibits to her motion: the Declaration of Holly R. Holecek in support of the motion; a copy of the Complaint (Ex. A); a copy of Cabrera's answer to the Complaint (Ex. B); portions of the transcript of Cabrera's pre-trial deposition (Ex. C); entity information for CityGrace Corp. from the New York State Department of State, Division of Corporations website (Ex. D); entity information for CityGrace Corp. from the New York State eAccessNY Occupational Licensing Management System website (Ex. E); the Debtor's voluntary petition, schedules and statement of financial affairs (Ex. F); the Debtor's amended statement of financial affairs (Ex. G); the Order approving the employment of the Firm as counsel to the Debtor (Ex. H); the docket sheet maintained by the Clerk of the Court 3 for the Debtor's prior Chapter 11 case, for November 2, 2021 onward (Ex. I); the order approving the employment of the Firm as counsel to the Debtor in the prior Chapter 11 case (Ex. J); the Debtor's motion to sell dated November 9, 2021 that was filed in the Debtor's prior Chapter 11 case (Ex. K); the response to the objection to the Debtor's motion to sell dated December 3, 2021 that was filed in the Debtor's prior Chapter 11 case (Ex. L); the Sale Order from Kaspar's prior Chapter 11 case (Ex. M); the notice of consummation of the sale of certain property that was filed in the Debtor's prior Chapter 11 case (Ex. N); the bank statement produced by Defendant Cabrera to the Trustee for account ending 397 at TD Bank in the name of "M Cabrera and Associates PC Esc Acct, Matthew M Cabrera Esc Agt" ("397 Account") for the period December 1, 2021 to December 31, 2021 (Ex. O); the bank statement produced by Defendant Cabrera to the Trustee for the 397 Account for the period February 1, 2022 to February 28, 2022 (Ex. P); the affirmation of Defendant Cabrera that was filed in the Debtor's current case on February 9, 2023 in opposition to the motion to dismiss the case (Ex. Q); the affidavit of DeLibero that was filed in the Debtor's current case on February 9, 2023 in opposition to the motion to dismiss the case (Ex. R); the affidavit of Defendant Debtor that was filed in the Debtor's current case on February 9, 2023 in opposition to the motion to dismiss the case (Ex. S); the Debtor's Response to the Order to Show Cause of the Court that was filed in the Debtor's case on March 2, 2023 (Ex. T); the Court's Order Converting Case to a Case Under Chapter 7 that was entered in Kaspar's ongoing Chapter 11 case on March 9, 2023 (Ex. U); the Trustee's May 25, 2023 letter to the Firm and Cabrera as counsel to Defendant Debtor (Ex. V); DeLibero's answer to the Complaint, with crossclaims against Cabrera (Ex. W); the answer to crossclaims that was filed on behalf of Defendants Firm and Cabrera in the above-captioned adversary proceeding (Ex. X); the answer filed on behalf of Defendant Debtor to the Complaint in the above-captioned adversary proceeding (Ex. Y); portions of the transcript of the deposition of Kaspar (Ex. Z); portions of the transcript of the deposition of DeLibero (Ex. AA); an email exchange dated January 31, 2022 that was produced by Defendant Cabrera (Ex. BB); an email exchange dated February 3, 2022 that was produced by Defendant Cabrera (Ex. CC); an email exchange dated February 2, 2022 and February 4, 2022 that was produced by Defendant Cabrera (Ex. DD); an email exchange dated February 3, 2022 and February 4, 2022 that was produced by Defendant Cabrera (Ex. EE); an email exchange dated February 3, 2022 and February 4, 2022 that was produced by Defendant Cabrera (Ex. FF); an email exchange dated February 3, 2022 and February 4, 2022 that was produced by Defendant Cabrera (Ex. GG); an email exchange dated February 3, 2022 and February 7, 2022 that was

4

(DeLibero filed summary judgment motions both on her crossclaims against Cabrera ("DeLibero Cabrera SJ," ECF Doc. # 40[3]) and on several of O'Toole's claims against her and CityGrace ("DeLibero O'Toole SJ," ECF Doc. # 39).)  Also pending are Cabrera's opposition to the O'Toole and DeLibero summary judgment motions ("Cabrera Opposition," ECF Doc. # 42,[4] refiled at ECF Doc. # 46), O'Toole's opposition to DeLibero's summary judgment motion ("O'Toole DeLibero Opposition," ECF Doc. # 43), O'Toole's opposition to Cabrera's summary judgment motion ("O'Toole Cabrera Opposition," ECF Doc. # 45), DeLibero's opposition to O'Toole's summary judgment motion ("DeLibero O'Toole Opposition," ECF Doc. # 48), DeLibero's opposition to Cabrera's summary judgment motion ("DeLibero Cabrera Opposition," ECF Doc. # 49), Kaspar's opposition to O'Toole's summary judgment motion ("Kaspar Opposition," ECF Doc. # 50), Cabrera's reply in further support of his summary judgment motion against O'Toole ("Cabrera O'Toole Reply," ECF Doc. # 51), Cabrera's reply in further support of his summary judgment motion against DeLibero ("Cabrera DeLibero Reply," ECF Doc. # 52), and O'Toole's reply in further support of her motion for partial summary judgment ("O'Toole Reply," ECF Doc. # 53).

For the following reasons, O'Toole's summary judgment motion is **GRANTED IN PART** and **DENIED IN PART**; Cabrera's motion is **GRANTED IN PART** and **DENIED IN PART**; and DeLibero's motions are **GRANTED IN PART** and **DENIED IN PART**.  This Opinion will proceed count by count.

---

produced by Defendant Cabrera (Ex. HH); and a letter dated September 29, 2023 from Dorf Nelson & Zauder LLP to Matthew Cabrera Esq. that was produced by Defendant Cabrera (Ex. II).  She also attaches a statement of undisputed material facts.

[3]     DeLibero attaches as Ex. A Kaspar's response to this Court's Order to Show Cause in his present Chapter 11 case; and as Ex. B the transcript of Cabrera's deposition ("Cabrera Dep. Tr.").  She also attaches a statement of material facts.

[4]     Cabrera re-attaches the same exhibits to his Opposition as he does to his Motion and labels them identically.  He also attaches a counter-statement of material facts.

# I.   <u>FACTUAL BACKGROUND</u>

The following are the facts of the case thus far.  Any disputed facts are indicated as such.

## A.  Kaspar's First Bankruptcy

Kaspar is a repeat filer in this Court.  He co-owns all of his property with his longtime

significant other, Grace DeLibero.  (DeLibero Dep. Tr. 70:16–24.)  DeLibero runs a company,

CityGrace Corp. ("CityGrace"), through which she operates her real estate business.  (*Id*. 11:7–

12:16.)  CityGrace does not itself co-own any property with Kaspar.  (Kaspar Dep. Tr. 15:17–22,

60:5–15.)  Kaspar has no ownership interest in CityGrace.  (DeLibero Dep. Tr. 13:11–13.)

Kaspar filed his first chapter 11 case on November 4, 2018.  (ECF Doc. # 37-2 ("O'Toole

Undisputed Facts" or "O'Toole U.F.") ¶ 17.)  By order dated July 9, 2019, the Court approved

the employment of Cabrera's Firm as counsel to the Debtor.  (*Id.* ¶ 18.)  In that prior case, the

Firm sought and obtained interim compensation awards of $165,832 in fees and $4,627.77 in

expenses.  (*Id.* ¶¶ 19–24.)  Cabrera never sought or obtained final approval of his compensation.

(*Id.* ¶ 26.)

In the prior case, Cabrera drafted and signed a sale motion dated November 9, 2021

which sought entry of an order approving the private sale of the Debtor's estate's interest in real

property located at Sprout Brook Road, Putnam Valley, New York 10579 (the "Property").  (*Id.*

¶¶ 27–28; *see also* Cabrera Dep. Tr. 40:7–10 (testifying that he drafted the sale order).)

Cabrera's proposed sale order reads, in pertinent part:

> FURTHER ORDERED, that at or as promptly as practical after the closing of the
> sale, the **Debtor shall set aside with his attorney, to be held in his attorney's
> escrow account, four hundred thousand dollars ($400,000.00),** the estimated
> amount of remediation costs as estimated by Environmental Consulting and
> Management Services. These funds are being escrowed for payment of the future
> remediation costs of parcel 72-1-47. **Once approval is obtained from the New
> York State Department of Environmental Conservation to begin remediation,**

**these funds will be disbursed to the Debtor's DIP account in draws**; and it is . .
.

FURTHER ORDERED, that **the terms and provisions of this Sale Order** and any actions taken pursuant hereto **shall survive entry of an order** which may be entered: (a) confirming any chapter 11 plan in this Chapter 11 case; (b) conversion of this Chapter 11 case to a case under chapter 7 of the Bankruptcy Code; (c) **dismissing this Chapter 11 case**; or (d) pursuant to which this Court abstains from hearing in this Chapter 11 case. **The terms and provisions of this Sale Order, notwithstanding the entry of any such orders described in (a)-(d) above, shall continue in this Chapter 11 case, or following dismissal of this Chapter 11 case** . . . .

(ECF Doc. # 282, Case No. 18-36862 (emphasis added).)  The property that needed remediation was called Cimarron Ranch.  (DeLibero Dep. Tr. 80:21–81:5.)  Cabrera testified that he "understood" the proposed sale order because he "wrote it," including the portion stating that the terms and provisions of the sale order would survive dismissal of the bankruptcy case.  (Cabrera Dep. Tr. 41:19–42:5.)

DeLibero signed a declaration annexed to Cabrera's sale motion.  (O'Toole U.F. ¶ 30). In it, she swore that she "consent[ed] to the sale of interest in the property as a co-owner of the Property" and "acknowledge[d] that the sale of [her] co-owner interest in the Property" was not a "detriment" to her "in any way."  (*Id.*)

In a separate filing in the prior case (a response to an objection to the sale motion), also drafted and signed by Cabrera, the Debtor represented that "the Debtor and co-owner [DeLibero] both agree that the funds" from the sale of the Property "are to be deposited in the Estate and set aside in escrow for the remediation of the subject contaminated property," and specified that "$400,000 will be set aside in escrow to fund the remediation."  (O'Toole U.F. ¶ 34.)

By order dated December 18, 2022, the Court approved the Debtor's sale of the Property. (*Id.* ¶ 35; *see also* Sale Order.)  The Sale Order contains the following language:

FURTHER ORDERED, that at or as promptly as practical after the closing of the sale, **the Debtor shall set aside with his attorney, to be held in his attorney's**

**escrow account, four hundred thousand dollars ($400,000.00),** the estimated amount of remediation costs as estimated by Environmental Consulting and Management Services. These funds are being escrowed for payment of the future remediation costs of parcel 72-1-47. **Once approval is obtained from the New York State Department of Environmental Conservation to begin remediation, these funds will be disbursed to the Debtor's DIP account in draws**; and it is . . .

FURTHER ORDERED, that **the terms and provisions of this Sale Order** and any actions taken pursuant hereto **shall survive entry of an order** which may be entered: (a) confirming any chapter 11 plan in this Chapter 11 case; (b) conversion of this Chapter 11 case to a case under chapter 7 of the Bankruptcy Code; (c) **dismissing this Chapter 11 case**; or (d) pursuant to which this Court abstains from hearing in this Chapter 11 case. **The terms and provisions of this Sale Order, notwithstanding the entry of any such orders described in (a)-(d) above, shall continue in this Chapter 11 case, or following dismissal of this Chapter 11 case** . . . .

(Sale Order (emphasis added).)  It is identical to Cabrera's proposed sale order.  On January 29, 2022, a sale notice ("Sale Notice") was filed with the Court, which Cabrera signed.  (O'Toole U.F. ¶¶ 37–38.)  The closing statement annexed to the Sale Notice stated that a court-ordered escrow of $400,000 was payable to Cabrera out of a total purchase price of $798,503.31, and $79,800 was payable to DeLibero and Kaspar for "additional expenses."  (*Id.* ¶¶ 39–41.)  The bank statement for an account ending in 397 at TD Bank in the name of "M Cabrera and Associates PC Esc Acct, Matthew M Cabrera Esc Agt" for the period December 1, 2021 to December 31, 2021, reflects an incoming wire transfer on December 28, 2021 from SMPR Title Agency, Inc. in the amount of $400,000 (*i.e.*, the Court-ordered escrow).  (*Id.* ¶ 42.)

On February 3, 2022, the Court dismissed Kaspar's prior chapter 11 case, and the case was closed on February 4.  (*Id.* ¶¶ 45–46.)

### B. Money Taken From Escrow Account

What followed can be *generously* characterized as a profound failure to grasp the concept of an escrow account.

Cabrera testified that, when he received the $400,000 from the sale of the Property, it was wired into an escrow account which had already been established. (Cabrera Dep. Tr. 19:8–19.) He testified that he had no procedure to handle escrowed money, and that escrowed money is "released, when, generally, I'm directed by the client or directed by the court." (*Id.* 24:4–15.) If he gets such an order, he generally keeps copies and "usually [the order is] saved." (*Id.* 24:24–25:8.)

Kaspar understood that the $400,000 in escrow was set aside for the purpose of remediation. (Kaspar Dep. Tr. 52:1–6 ("Q: What was the purpose of the $400,000? A: To go into escrow for remediation of the farm. Q: Got it. So the $400,000 in your mind was earmarked for remediation? A: That is correct."); *see also id.* 74:5–76:7.) DeLibero, too, testified that she "understood . . . perfectly" the Sale Order, in its entirety—*i.e.*, including the escrow language. (DeLibero Dep. Tr. 34:2–8.) She also testified that she "had no objection to having [the lawyers] put that money [$400,000] into the escrow account for the cleaning," and knew that "it was to be distributed and that was the court order, as needed, for the cleanup" (*i.e.*, the remediation). (DeLibero Dep. Tr. 32:11–33:10.)[5] As noted above, Cabrera testified that he understood the full contents of the Sale Order, since he drafted it.

In late January 2022, Cabrera and Kaspar exchanged emails, trying to decide what course to pursue as the prior bankruptcy proceeding approached a close. Cabrera wrote to Kaspar that

---

[5]    DeLibero subsequently stated that it was her understanding that the full $400,000 would not be needed for remediation, but that $400,000 was "set aside so that . . . they would have a cushion." (DeLibero Dep. Tr. 33:3–35:4.)

"[o]ne positive" of dismissal would be "that you will be free of the courts [sic] oversight." (ECF Doc. # 37 at 502.) When Kaspar asked what would happen to the $400,000 in escrow in case of dismissal, Cabrera responded, "In essence I would be free to release the funds." (*Id.*)

Cabrera and DeLibero exchanged several emails concerning the money in the escrow account. DeLibero expressed concern about the town of Putnam "trying to grab it"—"it" meaning the "escrow money." (*Id.* at 505; Cabrera Dep. Tr. 60:15–19; DeLibero Dep. Tr. 48:2–10.) Cabrera responded, "[t]he town cannot reach into the law firm [escrow] account. Your money is actually safer in my escrow account if that is a concern of yours." (ECF Doc. # 37 at 505.)

In another email exchange, this one in early February 2022, Cabrera instructed Kaspar to close his DIP account from his prior bankruptcy and to open a new bank account. (*Id.* at 510; *see also* ECF Doc. # 90 ¶ 18, Case No. 22-10382 (Debtor's Response to the Order to Show Cause of the Court) ("Counsel advised the Debtor to cease use of the DIP account and to close the DIP account as part of the closure of the case . . .").) Cabrera then sent Kaspar a bill for legal work. (ECF Doc. # 37 at 510.) In response, Kaspar asked Cabrera, "How much are you remitting from escrow?" (*Id.* at 509.) Cabrera explained that he was going to wire $272,100.34 to DeLibero and $3,399.66 to Kaspar out of the $400,000 escrow account, and was taking $120,000 for himself. (*Id.*) Kaspar responded, "Understood, [t]hat's fine . . ." (*Id.*) He also stated, "You can send it all to [Grace]"—Grace DeLibero—and "[t]he citygrace account should work." (*Id.* at 512, 515.)

The bank statement for an account ending in 397 at TD Bank in the name of "M Cabrera and Associates PC Esc Acct, Matthew M Cabrera Esc Agt" for the period February 1, 2022 to February 28, 2022, reflects an outgoing wire transfer on February 7, 2022 to "Citigrace Corp" in

the amount of $276,100 ("CityGrace Transfer"), as well as two transfers to the Firm totaling

$124,500.00 (together, the "Firm Transfers") as follows: (a) the sum of $120,000 by check

number 132 dated February 7, 2022 payable to the Firm, with "Kasper" in the memo; and (b) the

sum of $4,500 by check number 133 dated February 7, 2022 payable to Defendant Firm, with

"DiLibero" in the memo.[6]  (O'Toole U.F. ¶¶ 47–48.)  In his deposition, Cabrera laid out how the

$400,000 in the escrow account was split up between himself, DeLibero, and Kaspar:

$276,600.34 went to DeLibero as "her share from the sale of the property," $123,399.66 to

Kaspar as "his share after money was distributed to him from the sale," and $120,000 to Cabrera

and his firm "for the firm's fee."  (Cabrera Dep. Tr. 65:19–66:3.)  Cabrera and the Firm had not

sought authority from the Court for the money they took as a fee payment.  (*Id.* 66:4–10.)

Not a dollar of the $400,000 in escrowed funds went into Kaspar's DIP account as

required by the Sale Order.  The DIP account survived the dismissal of the prior bankruptcy,[7]

and it was Cabrera himself who instructed Kaspar to close the account after his earlier Chapter

11 had been dismissed (*see supra*).

Cabrera claims that Kaspar and DeLibero promised to spend the money they received on

remediation.  (Cabrera SJ at 9–10.)  O'Toole disputes this.  (ECF Doc. # 47 (O'Toole

Counterstatement of Disputed Fact) ¶¶ 14, 16.)  Regardless of intent, this did not occur.  Kaspar

testified that he spent "[m]aybe four, maybe six" thousand dollars on remediation, and that

DeLibero spent "nothing" on it.  (Kaspar Dep. Tr. 72:9–73:1.)  As for what Cabrera deemed to

be the "Debtor's portion of the escrowed funds," he took it for himself, applying it "towards my

attorney's fees," which he viewed as "court approved as administrative fees and given priority."

---

[6]     It appears that Cabrera paid himself this additional $4,500 for work his firm performed separately for
DeLibero.  (ECF Doc. # 37 at 509.)

[7]     Cabrera instructed Kaspar to close his DIP account on the same day as the Court entered an order
dismissing Kaspar's prior Chapter 11 (February 3, 2022)

(ECF Doc. # 83, Case No. 22-10382, at 15 ¶ 56.)  It bears repeating: Cabrera never received final
approval for his fees in the prior bankruptcy, nor did he ever seek (or gain) approval for the
payment of $120,000 from the escrow account.  (*See supra*.)

DeLibero testified that she directed Cabrera to transfer money to her from the $400,000
escrow account—specifically, to send it to CityGrace Corp.  (DeLibero Dep. Tr. 48:17–24.)  She
did not spend any of that money on remediation costs.  (Kaspar Dep. Tr. 72:23–73:1.)  DeLibero
explained that she, Cabrera, and Kaspar had "a three-way conversation about" the escrow
account, and claims that she thought she could do whatever she wanted with the money, since
Cabrera "did say that the [bankruptcy] case would be over and I [DeLibero] can release the
funds" from the escrow account.  (DeLibero Dep. Tr. 55:19–56:22.)  She claims that, during a
discussion with Kaspar and Cabrera prior to the dismissal of Kaspar's earlier Chapter 11,
Cabrera told her that "he'd be able to release [the funds] and give me [DeLibero] my share of
what was owed."  (*Id*. 56:23–57:25.)  She testified that she believed that some portion of the
money in escrow was her money.  (*Id.* 56:18–20 ("I believe that when he gave—gave me the
money, that was my money, it was my share of what was owed . . .").)  And while she was
"happy to keep that money in escrow" at the time the case was dismissed, she blamed the Town
of Putnam for the failure to remediate, alleging that the town "refused to allow any remediation
to go forward"—hence, presumably, DeLibero's decision to simply take the escrowed money, in
violation of the Sale Order, and use it for her own purposes.  (*Id*. 56:23–57:25.)

Cabrera testified that Kaspar, his client, directed him to disburse money from the escrow
account.  (Cabrera Dep. Tr. 69:3–16.)  The one piece of evidence Cabrera could point to in
support of this claim was an email Cabrera sent to Kaspar detailing how he planned to dole out
the money, to which Kaspar responded, "Understood. That's fine."  (Cabrera Dep. Tr. 69:12–

70:7; *see also* ECF Doc. # 37 at 509.)  However, in a separate motion to this Court, drafted and

signed by Cabrera, he stated, "Mr. Kaspar never requested the release of the funds [in the escrow

account] and received nothing from the Escrow account.  After the Debtor's [prior] bankruptcy

was dismissed, the non-debtor co-owner, Ms. DeLibero requested the return of her share of the

funds." (ECF Doc. # 83, Case No. 22-10382, at 14 ¶¶ 53–54.)  During his deposition, Cabrera

testified that he could not recall an instance when he asked Kaspar how he wanted Cabrera to

disburse the escrowed funds.  (Cabrera Dep. Tr. 70:24–71:9.)  Kaspar testified in a sworn

affidavit that, while it "was [his] understanding that half of the funds that were being held in

escrow belonged to [his] partner, the non-debtor co-owner of the Property, Grace DeLibero,"

Kaspar "did not instruct her to request my attorney turnover her share of the proceeds from the

sale of the parcels after the dismissal of my first bankruptcy filing—she did this of her own

accord." (*Id.* at 39 ¶¶ 32, 34.)  It is therefore unclear from the record presently before the Court

whether Kaspar instructed Cabrera, his attorney, to disburse the funds from escrow.

Cabrera argues that the condition precedent specified in the escrow agreement for

distributing the $400,000 to the Debtor's DIP account—approval by the DEC—occurred.  To

support his claim, he submits a letter from the DEC dated November 16, 2021, which reads as

follows:

> The Region 3 Division of Materials Management (DMM) has finished its review of the Site Investigation Report and Proposed Remedial Action Work Plan (SIR/PRAWP) for the fill areas at the Cimarron Ranch submitted by ECMS on September 29, 2021.  The SIR/PRAWP was submitted to address violations of 6 NYCRR Part 360 Regulations at the site.
>
> The SIR identifies two areas of higher concern based on three test pit results. The two areas are test Pit #1 (area 1) and test Pits #5 & #6 (area 2).  Area's [sic] 1 and 2 exhibited the highest concentration of Construction & Demolition (C&D) debris and exhibited elevated analytical results.  The PRAWP proposes to excavate and remove the C&D from these two areas and transport them to an authorized facility.  DMM agrees that these two areas should be prioritized for excavation and

removal.  Please notify DMM within five (5) business days prior to the beginning
of excavation and removal activities commence.

(Ex. L to Cabrera Aff.; *see also* Cabrera Aff. ¶ 25.)  Cabrera believes that the language in this

letter indicates that the DEC approved the remediation plan provided by the Debtor's then-

contractor ECMS.  (Cabrera SJ at 9.)[8]  However, it is far from clear whether DEC approval was

ever actually obtained.  The Sale Order, which was entered on December 8, 2021, provides,

"*Once approval is obtained* from the New York State Department of Environmental

Conservation . . . ."  (Sale Order (emphasis added).)  The Sale Order postdates the DEC letter

Cabrera relies on.  In addition, Kaspar wrote to Cabrera in February 2022 that he was *at that time*

"working on a remediation plan which *should* satisfy the DEC" (ECF Doc. # 37 at 518 (emphasis

added)), suggesting that at that time, approval had not yet been obtained.  Moreover, the Debtor,

through a motion signed by Cabrera, submitted an application to employ an environmental

consulting firm in the ongoing Chapter 11 case in July 2022.  (ECF Doc. # 45, Case No. 22-

10382.)  This application states that the purpose of hiring the firm was to "remediate the property

referred to as Cimarron Ranch in accordance with the approved remediation plan drafted by

Environmental Consulting and Management Services . . . and approved by the New York State

Department of Environmental Conservation," which indicates that the DEC *did* approve a plan.

(*Id.* at 3.)  Later on, however, the application specifies that the services the consulting firm would

provide include "[s]ubmit[ting] for and receiv[ing] any and all necessary permits to facilitate the

approved remediation plan . . . [o]verse and supervise the commencement and completion of the

approved remediation plan; and . . . *[s]ubmit for and receive final approvals* concerning the

remediation plan from the NYSDEC."  (*Id.* at 4 (emphasis added).)  It also states that the

---

[8]        Cabrera also cites to the Sale Order (Ex. M to the Cabrera SJ).  It is not clear to the Court why he did this—
as discussed, the language of the Sale Order undermines his argument.

consulting firm was hired "to *formulate a remediation plan*." (*Id.* at 10 (emphasis added).) It is therefore not clear from the record presently before the Court whether the DEC has ever approved *any* remediation plan, let alone by the time the funds in escrow had been disbursed in violation of the Sale Order. What is clear is that Kaspar never paid the costs of remediation.

### C. Kaspar's Second Bankruptcy

Kaspar filed under Chapter 11 a second time on March 28, 2022. (O'Toole U.F. ¶ 13.) The Firm was again employed as counsel to the Debtor. (*Id.* ¶ 14.)

In response to a motion to dismiss the present case, Cabrera submitted an affirmation in which he stated that he was faced with a "dilemma": according to him, "the [Sale] Order was inconsistent . . . . I had a co-owner, who was not my client [i.e., DeLibero] demanding the return of her funds. My decision was to pay Ms. DeLibero the portion of the funds belonging to her . . . . The Debtor's portion of the escrowed funds, the same were applied toward my attorney's fees, court approved as administrative fees and given priority." (ECF Doc. # 83, Case No. 22-10382, at 14–15 ¶¶ 55–56.) DeLibero also submitted an affidavit in which she swore, "I requested that my share of the proceeds from the sale be returned to me . . . . I still have a small portion of the funds that were returned to me from the sale of the original of the Properties." (*Id.* at 20 ¶¶ 21, 24.) Kaspar likewise submitted an affidavit in which he stated: "It was my understanding that all parties knew that half of the funds that were being held in escrow [i.e., $200,000] belonged to my partner, the non-debtor co-owner of the Property, Grace DeLibero . . . . Ms. DeLibero received a check for two hundred and seventy-six thousand dollars from the escrow account. The remainder of the money was paid to my attorney to satisfy his approved attorney fees after my attorney agreed to discount his fees." (*Id.* at 40 ¶¶ 32, 38.)

This Court issued an Order to Show Cause why the Debtor's bankruptcy should not be converted to a Chapter 7 or, in the alternative, why a Chapter 11 trustee should not be appointed. (ECF Doc. # 86, Case No. 22-10382.)  The Debtor submitted a response to the Order to Show Cause, which Cabrera signed.  (ECF Doc. # 91, Case No. 22-10382.)  The response states, in pertinent part:

> Subsequent conversations were had between the [Defendant] Debtor, ECMS, [Defendant Firm] and [Defendant DiLibero] regarding the steps now needed to begin the remediation process. It was decided that due in part to the need for immediate funds to attempt to comply with the new requirements introduced by the Town and that [Defendant] Debtor was closing the DIP account, that **the funds from [Defendant Firm's] escrow account would be turned over to [Defendant] Debtor and [Defendant DiLibero] in separate disbursements to accounts upon their direction**. After further conversations with [Defendant] Debtor . . . [Defendant] Debtor and [Defendant DiLibero] agreed to pay the firm $4500.00 to pursue legal representation to dismiss those violations thereby removing from the Town's unsubstantiated hurdles and quickly clearing a path to beginning the remediation process. [Defendant] Debtor and [Defendant Firm] decided that instead of issuing a wire payment to the Debtor's DIP account, incurring a fee for such and then the Debtor writing a check from the DIP account back to the firm, thereby delaying its closing, that **[Defendant Firm] should take the payment from the escrow account directly** as a convenience and a way to avoid additional fees and time.

(*Id*. (emphasis added).)  In other words, the defendants in this case repeatedly concede the essential point: $400,000 was disbursed in a manner contrary to the conditions in the Sale Order.

On March 9, 2023, this Court converted Debtor's case from a Chapter 11 to a Chapter 7 ("Conversion Order," ECF Doc. # 94 (case no. 22-10382)).  The Conversion Order provides:

> Having considered the Cabrera Response and the U.S.T. Response, the Court concludes that **Kaspar and Cabrera violated the Sale Order** entered in Kaspar's prior Chapter 11 case.  The Sale Order required that $400,000 in proceeds for the sale of two properties owned by Kaspar be deposited in escrow with Cabrera, with that sum to be used in connection with remediation of environmental contamination on another property owned by Kaspar.  (Sale Order at 4.)  The Sale Order provided that the terms of the Order survived any order dismissing the Chapter 11 case.  (*Id*. at 9.)  Instead, **upon dismissal of the case on the Motion of the United States Trustee, Cabrera released the escrowed funds, paying a portion of the funds to Kaspar, a portion to Kaspar's partner, and kept a portion of funds in**

16

**payment of his attorney' fees.  None of the funds were used for remediation costs.**  According to Cabrera, only about $4,000 is deposited in Debtor's DIP account.

(*Id.* at 1–2 (emphasis added).)

### D. Adversary Proceeding

#### 1.  Complaint

On July 28, 2023, O'Toole, as Chapter 7 Trustee for the Debtor's estate, commenced the above-captioned adversary proceeding.  (ECF Doc. # 1.)  Based on the above facts, O'Toole seeks turnover of the $400,000 court-ordered escrow to the Trustee, among other relief.  She brings the following claims:

| CLAIM | DEFENDANT(S) | STATUS |
|---|---|---|
| First Claim for Relief: Injunctive Relief | Firm, Cabrera, CityGrace, DeLibero | Cabrera, Firm, DeLibero seek to dismiss on summary judgment. |
| Second Claim for Relief: Turnover of Property of the Estate | DeLibero, Cabrera, Firm, CityGrace (voluntarily dismissed as to Kaspar, *see* ECF Doc. # 19) | Cabrera, Firm seek to dismiss on summary judgment. |
| Third Claim for Relief: Turnover of Recorded Information | Firm, CityGrace | Withdrawn.  *See* O'Toole Cabrera Opp. at 3 n.3. |
| Fourth Claim for Relief: Breach of Fiduciary Duty of Escrow Agent | Cabrera, Firm | O'Toole seeks summary judgment in favor of the plaintiff. Cabrera, Firm seek to dismiss on summary judgment. |
| Fifth Claim for Relief: Aiding and Abetting Breach of Fiduciary Duty of Escrow Agent | DeLibero, Kaspar | O'Toole moves for summary judgment. DeLibero cross-moves for summary judgment. |
| Sixth Claim for Relief: Negligence of Escrow Agent | Cabrera, Firm | Withdrawn.  *See* O'Toole Response at 3 n.3. |
| Seventh Claim: Legal Malpractice | Cabrera, Firm | Cabrera, Firm seek to dismiss on summary judgment. |
| Eighth Claim: Avoidance and Recovery of Preferential Transfers | Firm | Cabrera, Firm seek to dismiss on summary judgment. |

| Ninth Claim: Avoidance and Recovery of Fraudulent Transfer | CityGrace | Not up for summary judgment. |
|---|---|---|
| Tenth Claim: Avoidance and Recovery of Fraudulent Transfer | CityGrace | DeLibero/CityGrace move for summary judgment. |
| Eleventh Claim: Avoidance and Recovery of Fraudulent Transfer | CityGrace | DeLibero/CityGrace move for summary judgment. |
| Twelfth Claim: Avoidance and Recovery of Fraudulent Transfer | CityGrace | DeLibero/CityGrace move for summary judgment. |
| Thirteenth Claim (in the alternative): Avoidance and Recovery of Preferential Transfer | CityGrace | DeLibero/CityGrace move for summary judgment. |
| Fourteenth Claim: Monies Had and Received | Firm | Cabrera, Firm seeks to dismiss on summary judgment. |
| Fifteenth Claim: Monies Had and Received | CityGrace | DeLibero/CityGrace move for summary judgment. |
| Sixteenth Claim: Unjust Enrichment | CityGrace | DeLibero moves for summary judgment. |

(ECF Doc. # 1.)

The Firm, Cabrera, DeLibero, and CityGrace filed answers to the Complaint. In her answer, DeLibero asserts crossclaims against Cabrera, alleging that, as escrow agent, he breached his duty of care by acting with negligence, and that he committed legal malpractice. (ECF Doc. # 18 at 37–39.)

2. <u>Summary Judgment Motions</u>

This Court granted O'Toole, Cabrera, and DeLibero permission to seek summary judgment. (ECF Doc. # 35). Each filed a summary judgment motion, listed *supra*.

The only claim in the Complaint *not* up for consideration on these motions is Count 9. The Opinion will address each of the other claims in order below.

## II.    LEGAL STANDARD

### A.  Summary Judgment

Federal Rule of Civil Procedure 56 applies in adversary proceedings pending in

bankruptcy court. FED. R. BANKR. P. 7056.  A court should only grant summary judgment under

Rule 56 when "the pleadings, the discovery and disclosure materials on file, and any affidavits

show that there is no genuine issue as to any material fact and that the movant is entitled to

judgment as a matter of law." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008)

(quoting FED. R. CIV. P. 56(c)) (internal quotation marks omitted).  Issues of non-material fact,

however, will not prevent a court from awarding a party summary judgment. *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ("[T]he mere existence of *some* alleged factual

dispute between parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in

original).  Facts are material if they "might affect the outcome of the suit under the governing

law." *Overton v. New York State Div. of Military and Naval Affairs*, 373 F.3d 83, 89 (2d Cir.

2004) (quoting *Anderson*, 477 U.S. at 248) (internal quotation marks omitted).

On a motion for summary judgment, the movant bears an initial burden to come forward

with evidence that satisfies "each material element of his claim or defense, demonstrating that he

is entitled to relief." *Isaac v. City of New York*, 701 F. Supp. 2d 477, 485 (S.D.N.Y. 2010)

(internal citation omitted).  Once the movant has made this initial showing, the nonmoving party

must provide evidence of a genuine issue of fact in order to successfully oppose the motion.

*Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010).  A factual issue is genuine

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party,"

*Anderson*, 477 U.S. at 248, and all inferences to be drawn from the underlying facts must be

viewed in the light most favorable to the party opposing the motion. *Hotel Emps. & Rest. Emps. Union, Local 100 v. City of N.Y. Dep't of Parks and Recreation*, 311 F.3d 534, 543 (2d Cir. 2002). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Ning Yen Yao v. Karen Kao (In re Kao)*, 612 B.R. 272, 280 (Bankr. S.D.N.Y. 2020) (internal citation omitted). Rather, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). Alternatively, the opposing party may also make "showing that the materials cited do not establish the absence or presence of a genuine dispute." FED. R. CIV. P. 56(c)(1)(B). While a court need only consider the cited materials, "it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). If the nonmoving party is unable to provide evidence of a genuine issue of material fact, "the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

Courts apply the same standards when considering cross-motions for summary judgment as are used for individual motions for summary judgment. *In re Worldcom, Inc.*, 361 B.R. 675, 681 (Bankr. S.D.N.Y. 2007) (citing *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)). Each motion must be considered independently of the other and the court must consider the facts in the light most favorable to the non-moving party for each. *Id.* In such a situation, the court is not required to grant judgment as a matter of law for one side or the other. *Id.*

Parties moving for or responding to a motion for summary judgment are required to file statements of material undisputed facts in compliance with Local Bankruptcy Rule 7056–1.

### B. Bankruptcy Court Jurisdiction

Apart from the Trustee's statement in her Complaint that the adversary proceeding as a whole is a core proceeding (ECF Doc. # 1 at 2), none of the parties discuss whether they consent to entry of a final order by this Court in any of their filings, nor do they address the issue whether this adversary proceeding is a core or non-core proceeding. This means that these submissions are in violation of FED. R. BANKR. P. 7008, which requires, in adversary proceedings, that "[a] responsive pleading shall include a statement that the party does or not consent to entry of final orders or judgment by the bankruptcy court." Whether the claims at issue are core or non-core matters, because it affects this Court's ability to issue a final order in the case. Courts may nonetheless infer implied consent to a bankruptcy court entering final judgment with the "key inquiry [being] whether 'the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case.'" *Wellness International Network, Ltd. v. Sharif*, 575 U.S. 665, 685 (2015) (quoting *Roell v. Withrow*, 538 U.S. 580, 590 (2003)).

However, the issue of consent need not be resolved now. This Opinion does not dismiss all of the claims in the adversary complaint. Orders dismissing fewer than all claims in an adversary proceeding—including orders for partial summary judgment—are considered interlocutory. *O'Toole v. McTaggart (In re Trinsum Grp., Inc.)*, 467 B.R. 734, 740 (Bankr. S.D.N.Y. 2012). And even absent consent, "a bankruptcy court may enter partial summary judgment in related-to adversary proceedings without submitting proposed findings of fact and conclusions of law." *Wythe Berry Fee Owner LLC v. Wythe Berry LLC (In re Wythe Berry Fee Owner LLC)*, 654 B.R. 524, 527 n.2 (Bankr. S.D.N.Y. 2023); *see also In re Trinsum*, 467 B.R. at 741–42 (holding that the bankruptcy court is not required to submit proposed findings of fact and conclusions of law when granting a motion for partial summary judgment on related-to claims).

21

## III.   DISCUSSION

### A.  Count 2[9]: Turnover of Property of the Estate

Both Cabrera and O'Toole seek summary judgment on this claim.

Section 542(a) of the Bankruptcy Code governs turnover of property of the estate held by

an entity that is not a custodian.  *DeFlora Lake Dev. Assocs., Inc. v. Hyde Park (In re DeFlora*

*Lake Dev. Assocs., Inc.)*, 628 B.R. 189, 204 (Bankr. S.D.N.Y. 2021).  Specifically, section

542(a) provides in relevant part that, subject to certain exceptions:

> [A]n entity, other than a custodian, in possession, custody, or control, during the
> case, of property that the trustee may use, sell, or lease under section 363 of this
> title, or that the debtor may exempt under section 522 of this title, shall deliver to
> the trustee, and account for, such property or the value of such property, unless such
> property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a).[10]  Accordingly, "[t]o prevail on a claim under section 542(a), the party

seeking turnover must establish (1) that the property is or was in the possession, custody or

control of [another] entity during the pendency of the case, (2) that the property may be used . . .

in accordance with § 363 or exempted by the debtor under § 522; and (3) that the property has

more than inconsequential value or benefit to the estate."  *LaMonica v. CEVA Grp. PLC (In re*

*CIL Ltd.)*, No. 13-11272-JLG, 2024 WL 1693626, at *45 (Bankr. S.D.N.Y. Apr. 18, 2024)

(alterations in original) (internal citation and quotation marks omitted).  Generally, "[i]t is

fundamental to a turnover claim that the subject property belongs to the estate," and it is the

"party seeking turnover bears the burden of proving, by a preponderance of the evidence" that

this is so.  *Id.* (citations omitted).  Thus, for "section 542(a) to apply, there must be no dispute

---

[9]      We begin with Count 2, as Count 1 is for injunctive relief, the availability of which rides on the existence
of a separate viable argument for relief.

[10]      "Escrow agents are generally not considered 'custodians' under § 101(11) of the Bankruptcy Code because
they are not 'engaged in the general administration of the debtor's assets for the benefit of creditors.'" *In re DeFlora
Lake Dev. Assocs., Inc.*, 628 B.R. at 204.  This limitation in section 542 of the Code therefore does not bar the
Trustee from pursuing a turnover theory.

that the property that is the object of the turnover claim is estate property." *Id.* (citations omitted). The key question, then, is whether the $400,000 (meant to be) in escrow is property of the estate.

Section 541 provides that the debtor's "estate is comprised of all of the following property, wherever located: . . . all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). However, § 541(d) qualifies the otherwise broad scope of this definition by providing that "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." *Id.* In other words, "[t]o the extent such an interest is limited in the hands of the debtor, it is equally limited in the hands of the estate." 124 Cong. Rec. H11096 (daily ed. Sept. 28, 1978) (remarks of Sen. DeConcini). Section 541 does not expand a debtor's rights beyond those that were available to him upon the filing date of the petition. *Mendelsohn v. Gonzalez (In re Gonzalez)*, 559 B.R. 326, 329–30 (Bankr. E.D.N.Y. 2016) ("A trustee takes no greater rights than the debtor had on the date of filing the petition."). "Whether a particular item is property of the estate in bankruptcy is governed by principles of state law . . . and the assessment is made as of the date of the filing of the bankruptcy petition." *In re Mid-Island Hosp., Inc.*, 254 B.R. 71, 74 (E.D.N.Y. 2000), *aff'd sub nom. In re Mid-Island Hosp., Inc.*, 276 F.3d 123 (2d Cir. 2002).

What, then, were Kaspar's rights in the escrowed property as of the time of filing of his second bankruptcy?

"The Bankruptcy Code does not operate to include property in the estate unless the debtor has a legal or equitable interest in the property. The Code itself does not determine the existence

of a legal or equitable interest in property—reference to state law is required." *TTS, Inc. v. CitiBank, N.A. (In re TTS, Inc.)*, 125 B.R. 411, 413–14 (Bankr. D. Del. 1991), *aff'd sub nom. Matter of TTS, Inc.*, 158 B.R. 583 (D. Del. 1993). All parties assume that New York law applies. "Because all parties have relied on New York State law in their memoranda of law, they have implicitly consented to the application of New York law . . . . This 'implied consent . . . is sufficient to establish choice of law.'" *Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758, 771 (S.D.N.Y. 2011) (internal citation omitted).

Under New York law, an escrow agreement exists if it is shown "that there is (a) an agreement regarding the subject matter and delivery of the funds, (b) a third-party depositary, (c) delivery of the funds to a third party conditioned upon the performance of some act or the occurrence of some event, and (d) relinquishment by the grantor or depositor." *Mortg. Elec. Registration Sys., Inc. v. Maniscalco*, 46 A.D.3d 1279, 1281 (N.Y. App. Div. 2007) (internal quotation marks, citations, and brackets omitted); *accord. Mid-Island Hosp., Inc. v. Empire Blue Cross and Blue Shield. (In re Mid–Island Hosp., Inc.)*, 276 F.3d 123, 130 (2d Cir. 2002). All parties assume that a valid escrow agreement was in place.

"Legal title is formal title that is evidenced by a deed or other instrument constituting evidence of ownership rights in property . . . . Equitable title, on the other hand, is a beneficial interest in property and . . . gives the holder the right to acquire formal legal title." *Lippe v. Genlyte Grp. Inc.*, No. 98 CIV. 8672(DC), 2002 WL 531010, at *4 (S.D.N.Y. Apr. 8, 2002) (cleaned up). Under New York law governing escrow accounts, grantors have legal title to the escrow account and grantees have equitable title until such time as the conditions precedent for release of the escrowed property are met, at which point the property is disbursed pursuant to the terms of the escrow agreement, and the legal and equitable titles merge in the grantee. *Hassett v.*

*Blue Cross Blue Shield of Greater N.Y. (Matter of O.P.M. Leasing Servs., Inc.)*, 46 B.R. 661, 667

(Bankr. S.D.N.Y. 1985) ("[U]nder New York law legal title to property placed in escrow remains

with the grantor until the occurrence of the condition specified in the escrow agreement . . . .

[T]he deposit of property placed in escrow creates in the grantee such an equitable interest in the

property that upon full performance of the conditions according to the escrow agreement, title

will vest at once in him . . . . [P]ending full performance of the conditions, the legal title remains

in the grantor.") (cleaned up) (collecting cases). Until proper disbursement, the grantor also has

an equitable, contingent right in the escrowed property. *Id.* ("[T]he grantor retains a contingent

right to repossess the property if the specified condition does not occur.") "Although the grantor

retains a contingent right to repossess the property if the specified condition does not occur, the

property must be beyond the possession and control of the grantor while it is in the hands of the

escrow agent." *Russo v. N.Y.S. Higher Educ. Serv. Corp. (In re Royal Bus. Sch., Inc.)*, 157 B.R.

932, 940 (Bankr. E.D.N.Y. 1993).

O'Toole argues that legal title to the escrowed funds remains with the Debtor's estate

under the plain language of the sale order, which designates the Debtor as the grantor: "Debtor

shall set aside with his attorney . . . four hundred thousand dollars." (O'Toole SJ at 22; *see also*

Sale Order.) Since the conditions precedent to distribution of the escrowed funds did not occur,

and since, under New York law, legal title to escrowed property remains with the grantor until

the satisfaction of conditions precedent to distribution, the estate retains, at a minimum, legal

title to the property. (O'Toole SJ at 22–23.) Cabrera accepts this and argues that legal title alone

is insufficient grounds for a turnover action, as legal title to an escrow account does not vest

escrowed *funds* in the debtor's estate. (Cabrera SJ at 17–18.) About this, he is correct: legal title

alone in an escrow account is insufficient to pull escrowed *funds* into the property of the estate.

25

*See Matter of O.P.M. Leasing Servs., Inc.*, 46 B.R. at 667 ("Courts of bankruptcy recognize that money held in escrow is not property which vests in the trustee in bankruptcy.") (cleaned up); *In re Royal Bus. Sch., Inc.*, 157 B.R. at 940–41 ("As noted by the Supreme Court, the legislative history to § 541 demonstrates that Congress intended to exclude from the debtor's estate property of others in which the debtor had some minor interest such as a lien or bare legal title . . . . [W]hen considering preference actions, the predominant rule is that a subsequent judgment or release of escrow monies does not deprive the estate of anything of value since the debtor reserves only a contingent right to the escrowed funds . . . . [M]ost courts considering the issue under New York law have held that escrow accounts are not property which would vest in the trustee in bankruptcy.") (cleaned up); *In re Simon*, 167 F. Supp. 214, 215 (E.D.N.Y. 1958) (concluding that an escrow account is not the type of property as would vest in the trustee under the Bankruptcy Act); *see also In re TTS, Inc.*, 125 B.R. at 414 (interpreting New York law and concluding that an escrow is not property of the estate). *But see In re Rosenshein*, 136 B.R. 368, 373–74 (Bankr. S.D.N.Y. 1992).

O'Toole makes several arguments for why equitable title still resided in the Debtor at the time of filing. She argues that "the estate retained contingent rights to repossess" the $400,000 in the event that the conditions precedent in the escrow agreement were not met, which they were not: "[b]ecause no portion of the court-ordered escrow was used for the remediation of [the debtor's property], the Trustee is entitled to turnover of the entire $400,000." (O'Toole SJ at 23.) A *contingent* right in property in escrow, however, is not sufficient to render that money property of the estate. The money was put in escrow to *remove it from Kaspar's control*, and any *contingent* right he may have had in it at the time of filing is of "no value to the estate because it [is] not an interest which a judgment creditor" of Kaspar's "could reach." *Matter of*

*O.P.M. Leasing Servs., Inc.*, 46 B.R. at 668 (holding that a grantor's contingent equitable right in property in escrow did not render escrowed property part of property of the debtor-grantor's estate); *see also In re Royal Bus. Sch., Inc.*, 157 B.R. at 940 ("Although the grantor retains a contingent right to repossess the property if the specified condition does not occur, the property must be beyond the possession and control of the grantor while it is in the hands of the escrow agent . . . . [T]hus . . . a subsequent judgment or release of escrow monies does not deprive the estate of anything of value *since the debtor reserves only a contingent right to the escrowed funds*.") (emphasis added); *Hooker Atlanta Corp. v. Hocker (In re Hooker Invs., Inc.)*, 155 B.R. 332, 339 (Bankr. S.D.N.Y. 1993) (concluding that, upon deposit of funds into escrow, "the debtor reserves only a contingent interest to those escrowed funds; a subsequent release of the monies does not deprive the estate of anything of value," so the deposited funds are not property of the estate notwithstanding the debtor-grantor's contingent equitable right in them).  Therefore, the fact that Kaspar's estate may have had a contingent interest in the $400,000 is itself insufficient to qualify those escrowed funds as part of his estate's property, as that property was removed from his estate when he deposited it into escrow.

Similarly, any argument that Kaspar's contingent remainder interest in whatever would have been left over in the escrowed fund post-remediation (in the counterfactual world where the Sale Order had not been violated and the $400,000 had not been squandered) created enough of a property right in the escrowed funds to enable the Trustee to seek turnover of the entire $400,000 sum fails on the same logic.  *See Dynasty Express Corp. v. Kurtzman (In re AGSY, Inc.)*, 120 B.R. 313, 317 (Bankr. S.D.N.Y. 1990) ("[U]ndisputed facts in this case reflect that the trustee in bankruptcy has a contingent remainder interest in the escrow funds to the extent of the balance of any proceeds held by the Trust Company, as escrow agent, after all environmental and other

27

specified claims have been satisfied in accordance with the terms of the Assets Purchase

Agreement and the escrow agreement.  Unless and until a balance remains after the contingency

is resolved, *the trustee in bankruptcy has no immediate possessory interest in the escrow funds*

*within the meaning of the concept of property of the estate* so as to entitle him to an order

directing the Trust Company, as escrow agent, to turn over any portion of the escrow fund.")

(emphasis added).  Moreover, a trustee can only seek turnover of *liquidated* amounts, and the

amount that would have been left over, in the counterfactual world where the money had not

been improperly disbursed, after remediation costs is not clear, nor is it specified by the Trustee.

*Savage Assoc., P.C. v. Mandl (In re Teligent, Inc.)*, 325 B.R. 134, 137 (Bankr. S.D.N.Y. 2005)

(holding that it is "well-settled law in this district that § 542(b) cannot be used to recover a

*disputed* pre-petition debt") (emphasis added); *Hassett v. Bancohio Nat'l Bank (In re CIS Corp.)*,

172 B.R. 748, 760 (S.D.N.Y. 1994) (stating that the language of § 542(b) creates "a strong

textual inference that an action should be regarded as a turnover only when there is no legitimate

dispute over what is owed to the debtor").

The Trustee also argues that Kaspar's estate has a *vested* (non-contingent) right in both

the legal and equitable title to the escrowed funds for one of two (contradictory) reasons.  Her

first rationale is that, because the Sale Order was violated and the conditions precedent for lawful

release of the funds were not met, Kaspar's contingent *equitable* right of reversion in the

escrowed funds *qua* grantor vested, reuniting legal and equitable title in the property in Kaspar as

*grantor*.  (O'Toole SJ at 23).  Her second argument, which should have been made in the

alternative, is that Kaspar was also the *grantee* of the escrowed funds (she is presumably relying

on the language in the Sale Order requiring the deposit of escrowed funds in the Debtor's DIP

account after DEC approval), and his *legal* interest in the property *qua grantee* brings the

escrowed funds into the property of the estate.  (O'Toole Reply at 9.)  The latter argument would only work if the precondition to fund distribution *had been met* (which is emphatically *not* the Trustee's position, *see* O'Toole Reply at 4), as property "being held in escrow [is] not subject to turnover [to a debtor-grantee] unless and until the conditions set forth in the escrow agreement are met," *In re DeFlora Lake Dev. Assocs., Inc.*, 628 B.R. at 205, and, as discussed above, a mere contingent right in property is insufficient to pull the funds into the debtor's estate. O'Toole's two arguments are contradictory: either the precondition for fund distribution (DEC approval) *had been met* and Kaspar *qua grantee* had full rights to the escrowed funds; or the precondition *had not been met* and *could not have been met* by the time Kaspar filed for bankruptcy, meaning that his reversionary equitable interest in the funds *qua grantor* vested.  As discussed *supra*, there is a factual dispute whether the DEC granted its approval to a remediation plan, and this issue cannot be decided at the summary judgment stage.  However, for reasons discussed below, this fact need not be determined now, as the Trustee loses on Count Two in either scenario.

Assuming without deciding that the DEC *did* approve a remediation plan and the precondition had been met, the escrow agreement provides that $400,000 should have flowed to the Debtor's DIP account, putting it within the property of the estate.  Setting aside the fact that the funds did *not* flow to the DIP account, there is a separate fact which bars the $400,000 from entering the property of the estate in such a manner.  There is a limitation inherent in the escrow agreement on how these funds were to be used: they were to be used *for remediation only* until that work had been fully paid for.  All parties agree on this.  The funds were, in other words, earmarked, which would have removed them from the ambit of the property of the estate *even if* they had been properly deposited in the escrow account.  The Second Circuit has held that

"where a debtor receives funds subject to a clear obligation to use that money to pay off a preexisting debt, and the funds are in fact used for that purpose, those funds do not become part of the estate and the transfer cannot be avoided in bankruptcy." *Cadle Co. v. Mangan (In re Flanagan)*, 503 F.3d 171, 185 (2d Cir. 2007). This is because funds set aside for a specific purpose—repayment of one preexisting creditor—do not enter the asset pool of the debtor, so a transfer of such property is not considered to be a transfer of property of the estate, as such a transfer does not "diminish the amount available for distribution to creditors." *Musso v. Brooklyn Navy Yard Dev. Corp. (In re Westchester Tank Fabricators, Ltd.)*, 207 B.R. 391, 397 (Bankr. E.D.N.Y. 1997); *see also* 11 U.S.C. § 541(b)(1) ("Property of the estate does not include . . . any power that the debtor may only exercise solely for the benefit of an entity other than the debtor."); *Henderson v. Stein & Day Inc. (In re Stein & Day Inc.)*, 80 B.R. 297, 304 (Bankr. S.D.N.Y. 1987) ("Funds do not become property of the debtor if the debtor transfers the funds as a conduit between an original transferor and an ultimate transferee," so long as the funds are "specifically segregated by the debtor or placed in a special account or trust for the creditor."). Because the Debtor would have received these funds "subject to a clear obligation to use that money to" remediate the Cimarron Ranch, the $400,000 would not truly have been under his control, and so would not have been considered property of the estate had he received them in his DIP account.

It may instead have been the case that the condition precedent to proper distribution of the funds—DEC approval for a remediation plan—became impossible to meet, amounting in a "failure of purpose" of the escrow (since the $400,000 was frittered away on everything but remediation) and an "unsatisfied condition." *Fisher v. N.Y.C. Dept. of Housing Preservation & Dev. (In re Pan Trading Corp.), S.A.*, 125 B.R. 869, 879–80 (Bankr. S.D.N.Y. 1991) (holding

that debtor's estate included debtor's residual interest in escrowed property when "agreed-upon conditions of that Escrow were not fulfilled" before filing for bankruptcy). This may well be the case, and O'Toole is free to try to establish it at trial. If this is so, Kaspar *qua* grantor's reversionary equitable interest in at least a portion of the $400,000 *did vest* by the time he filed for bankruptcy. Once the condition precedent in the Sale Order was irretrievably frustrated, both legal and equitable title to the escrowed property reunited in Kaspar—*but only insofar as he had rights to sale proceeds* from the property which generated the $400,000. As Cabrera points out, Kaspar only ever had a right to 50% of the proceeds from the sale of the Property—DeLibero, as equal co-owner, also had a right to 50%. (Cabrera Reply at 4.) The sale proceeds amounted to $798,503.31. $400,000 was put in escrow, and $79,800 was sent to DeLibero and Kaspar directly. (Ex. N to Cabrera Aff. at 2.) $73,400.68 went to Frank E. DeEsso, who was DeLibero's attorney during the sale process. (*Id.*) It is not clear where, exactly, this money went—how DeLibero and Kaspar split the $79,800, and whether DeEsso retained the full amount he received. It is also not clear whether Kaspar had rights to 50% of the *total* sale price, or to some reduced portion of that (e.g., after broker's fees, if any, were paid). Therefore, the portion of the $400,000 formerly in escrow to which Kaspar had legal and equitable rights on the day of his latest bankruptcy filing cannot presently be determined. Unfortunately for O'Toole, it is this final fact which bars her turnover claim. Section 542(b) provides for turnover of *undisputed* debts. "The terms 'matured, payable on demand, or payable on order' create a strong textual inference that an action should be regarded as a turnover only when there is *no legitimate dispute* over what is owed to the debtor." *In re CIS Corp.*, 172 B.R. at 760 (emphasis added) (concluding that an action should be regarded as a turnover proceeding under § 542(b) "only when there is no legitimate dispute over what is owed to the debtor"); *see also Penthouse Media*

31

*Grp. v. Guccione (In re Gen. Media, Inc.)*, 335 B.R. 66, 76 (Bankr. S.D.N.Y. 2005) ("Section

542(a) does not apply if title [to the property of which turnover is sought] is disputed.").

O'Toole herself is not definite about the amount owed to the Debtor's estate under a turnover

theory, dooming it.  (O'Toole Cabrera Opp. SJ at 15–16 (arguing first that all $400,000 should

be turned over to the Trustee, then claiming, "[a]t a minimum . . . it is clear that no less than half

of the Court-Ordered Escrow, *i.e.*, $200,000, was property of the Debtor.").)

For the above reasons, therefore, Cabrera's summary judgment motion on Count 2 is

**GRANTED**, and O'Toole's motion on Count 2 is **DENIED**.[11]  Count 2 is **DISMISSED**.

### E.  Count Four: Breach of Fiduciary Duty of Escrow Agent

O'Toole seeks summary judgment in her favor on this count against Cabrera and his

Firm, while Cabrera cross-moved for summary judgment.  In short, O'Toole's central argument

is that, in violating the Sale Order, Cabrera breached his duty as escrow agent to disburse

escrowed property in "strict compliance with the conditions imposed" in the escrow agreement.

(O'Toole SJ at 9.)

Cabrera advances a collection of defenses, most of which are grounded in neither law nor

fact.

First, he claims that the breach of fiduciary duty claim is premised on a finding that the

escrowed property was Kaspar's, so must fail as the escrowed funds are not part of the debtor's

estate.  (Cabrera SJ at 7.)  This is incorrect as a matter of law.  Under New York law, "[t]o state a

cause of action to recover damages for breach of fiduciary duty, a plaintiff must allege: '(1) the

existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly

---

[11]     The Trustee also argues that the Debtor's estate has a "superior equitable claim in and to the $400,000
Court-Ordered Escrow"—superior to the claims of all other parties.  (O'Toole Cabrera Opp. at 7.)  It is not clear
whence such a right could have arisen.  The Court will not address this argument.

caused by the defendant's misconduct.'" *United States Fire Ins. Co. v. Raia*, 94 A.D.3d 749, 751

(N.Y. App. Div. 2012) (internal citation omitted).  Whether the escrowed funds were part of the

property of the estate is irrelevant to this claim.  Moreover, to the extent that Cabrera is making a

standing argument, he is wrong.  "Under the Bankruptcy Code the trustee stands in the shoes of

the bankrupt corporation and has standing to bring any suit that the bankrupt corporation could

have instituted had it not petitioned for bankruptcy."  *Shearson Lehman Hutton, Inc. v. Wagoner*,

944 F.2d 114, 118 (2d Cir. 1991) (citing 11 U.S.C. §§ 541, 542).  Property of the estate under §

541 "includes all kinds of property, including tangible or intangible property, [and] causes of

action."  *Mitchell Excavators, Inc. v. Mitchell*, 734 F.2d 129, 131 (2d Cir. 1984) (internal citation

omitted).  Causes of action belonging to the debtor are part of the property of the estate.  *In re

Betty Owens Schools, Inc*., No. 96 Civ. 3576, 1997 WL 188127, at *2 n.1 (S.D.N.Y. Apr. 17,

1997) (collecting cases) (noting that, "[t]o become part of the bankruptcy estate, a cause of

action must belong to the debtor itself, either in whole or in part, and cannot belong solely to the

debtor's creditors or shareholders").  The *cause of action* O'Toole brings in Count Four is

property of the estate, as it belonged to the debtor even before his bankruptcy filing; whether the

escrowed funds were ever property of the estate is not relevant.  *See Grubin v. Rattet* (*In re Food

Mgmt. Grp., LLC*), 380 B.R. 677, 691–92 (Bankr. S.D.N.Y. 2008) (rejecting a similar argument:

"The . . . Defendants challenge the Trustee's standing to bring the complaint on the grounds that

the . . . bid deposit was never property of the estate and is therefore not recoverable by the

Trustee.  But the Trustee is not seeking to recover the bid deposit under Bankruptcy Code § 542,

or under the Trustee's avoidance powers under Bankruptcy Code § 544.  Rather, the Trustee

asserts causes of action for fraudulent concealment, conspiracy to commit fraudulent

concealment, breach of fiduciary duty, conspiracy to breach fiduciary duty, negligence and fraud

on the court, arising from alleged post-petition misconduct by the . . . Defendants.  These post-petition causes of action to the extent they seek to recover damages to the Debtors' estate are property of the estate under § 541.  *Whether the bid deposit was ever property of the estate is not relevant to these causes of action*.") (emphasis added).

Next, Cabrera argues that he did not actually violate the Sale Order because (1) Kaspar and DeLibero authorized and requested him to distribute the escrowed funds, (2) Cabrera released the funds in reliance on DeLibero's and Kaspar's representations that they would use $400,000 for remediation, and (3) the DEC had approved the remediation work.  (Cabrera SJ at 8–10.)  In light of these statements which Cabrera incorrectly frames as undisputed facts, he claims that "the release of money was reasonable and complied with the Sale Order because it fulfilled Kaspar's bankruptcy goals and the Sale Order's requirement to disburse money to pay remediation costs upon the DEC's approval."  (*Id.* at 10.)  This argument fails at every step.

First, as discussed above, whether Kaspar instructed Cabrera to release the escrowed funds is disputed, as is whether the DEC approved of any remediation plan.  These questions will not be resolved at this stage of the litigation.  But these factual issues are not relevant to Count Four.  It is black letter law in New York that escrow agents have "a duty not to deliver the property held in escrow to anyone except upon strict compliance with the conditions imposed in the escrow agreement."  *Baquerizo v. Monasterio*, 90 A.D.3d 587, 587 (N.Y. App. Div. 2011) (cleaned up); *see also T.T.S.G. v. Kubic*, 226 A.D.2d 132, 133 (N.Y. App. Div. 1996) ("As escrow agent, defendant owes a fiduciary duty to the parties to the transaction.").  The cases Cabrera cites are not to the contrary and do not support his position.  In *AQ Asset Mgmt., LLC. v. Levine*, 124 A.D.3d 558 (N.Y. App. Div. 2015), while the court dismissed a breach of fiduciary duty claim against an escrow agent as it related to a release of money authorized by a

34

beneficiary, there is no indication in the Appellate Division's or underlying trial court's decisions that this disbursement was in violation of the terms of the escrow agreement. *See also AQ Asset Management LLC v. Levine*, No. 652367/2010, 2014 WL 840418, at *1 (N.Y. Sup. Ct. Feb. 27, 2014) (trial court decision). Similarly, in *Baquerizo*, 90 A.D.3d at 587–88, there is no indication that the escrow agent violated the escrow agreement at issue in that case—in fact, the appellate and trial court opinions indicate that the escrow agent *complied* with the applicable agreement. *See id.* ("[T]he documentary evidence conclusively established . . . that the defendant . . . *did not breach the escrow agreement*, but instead properly disbursed the escrow funds upon receipt of notification from the plaintiffs specifically authorizing their release.") (cleaned up, emphasis added); *see also Giovanni Baquerizo & Alec Charles Capital, LLC v. Monasterio*, No. 004535/2010, 2010 WL 11241836, at *1 (N.Y. Sup. Ct. Oct. 20, 2010) (trial court opinion). And *99 Commercial St., Inc. v. Goldberg*, 811 F. Supp. 900 (S.D.N.Y. 1993) deals with a different issue entirely: the question of authorization there was whether escrow agents were authorized to enter into a customer agreement with a bank on behalf of the escrow's beneficiaries and thereby bind the beneficiaries to an arbitration clause in the customer agreement. *See id.* at 903–04. There was no allegation or indication that the escrow agents breached the escrow agreements in that case; that opinion is irrelevant to the present case. Cabrera is unable to support his argument that Kaspar's and DeLibero's instructions to release the escrowed funds relieved Cabrera of his fiduciary duties. The Court rejects the argument.

Second, there is no genuine argument that Cabrera did *not* violate the Sale Order. Even assuming that there was DEC approval, the Sale Order, which Cabrera drafted, clearly required Cabrera to deposit $400,000 in Kaspar's DIP account. There is no dispute that this did not happen. Very simply, he breached the escrow agreement. This Court has already so held.

Cabrera did not address this Court's earlier ruling. It is now the law of the case that Cabrera

violated the Sale Order. *See Zdanok v. Glidden Co., Durkee Famous Foods Div.*, 327 F.2d 944,

953 (2d Cir. 1964) ("[W]here litigants have once battled for the court's decision, they should

neither be required, nor without good reason permitted, to battle for it again."). The usual

justifications for deviating from prior rulings, including "an intervening change of controlling

law, the availability of new evidence, or the need to correct a clear error or prevent manifest

injustice," are not present. *Hosking v. TPG Cap. Mgt. (In re Hellas Telecommunications*

*(Luxembourg) II SCA)*, 555 B.R. 323, 343 (Bankr. S.D.N.Y. 2016) (internal citation omitted).

Cabrera should not and may not argue that he did not violate the Sale Order.

Third, Cabrera proffers an elaborate theory in an attempt to demonstrate that Kaspar's

estate did not suffer any damages from his actions, because it received all that it was entitled

to—its half of the proceeds from the sale of the Property after taxes, minus Cabrera's legal fees

which Kaspar would have had to pay anyway. (Cabrera Opp. at 16–18.) By comparison,

O'Toole's damages theory is straightforward: Cabrera improperly distributed $400,000 from

escrow, and therefore should repay the Trustee $400,000.[12] (O'Toole Opp. at 13.) The Court is

not convinced by either argument. At this stage of the litigation, there are open and material

questions of fact concerning the damages incurred by the Debtor's estate; it is not known, for

example, whether the Debtor's estate still has to pay for remediation, and if so, how much it

would cost. This seems to the Court to be essential in determining the harm which Cabrera

caused the estate. The question of damages, therefore, is not yet ripe for decision. Even if the

---

[12] The case O'Toole cites in support of this theory, *Piemonte v. Gruenberg, Kelly and Della*, 100 N.Y.S.3d
611 (N.Y. App. Term. 2018), is distinguishable. There, the plaintiff was owed a certain definite sum which was to
be paid out from an escrow account but was not. Here, Kaspar would have received the benefit of property
remediation plus whatever cash was left over after remediation, but he would not have received a definite sum
directly from the escrow account. It therefore does not follow from *Piemonte* that the appropriate damages in this
case are $400,000.

estate had suffered no damages, as Cabrera alleges, that is not fatal to the breach of fiduciary

duty claim, as under New York law, "damages have never been considered to be an essential

requirement for a cause of action founded on a breach of fiduciary duty." *Miami Firefighters'*

*Relief & Pension Fund v. Icahn*, 199 A.D.3d 524, 526 (N.Y. App. Div. 2021) (cleaned up).  The

Court will not grant Cabrera summary judgment on Count Four based on this argument.

Fourth and finally, Cabrera argues that a breach of fiduciary duty claim based on the

same facts and seeking the same damages as a legal malpractice claim must be dismissed as

duplicative.  (Cabrera SJ at 15.)

O'Toole's breach of fiduciary claim is based on Cabrera's releasing the escrowed funds

to the Firm and CityGrace within four days of the dismissal of Kaspar's old Chapter 11 case, in

violation of the terms of the Sale Order which Cabrera himself drafted and with which he, as

escrow agent, had a duty to strictly comply.  (Compl. ¶¶ 143–44, 147–49.)  Count Four seeks

"entry of an order and judgment against Defendant Cabrera and Defendant Firm: (a) adjudging

that Defendant Firm and Defendant Cabrera breached their fiduciary duties owed to the Debtor

and his creditors; (b) awarding damages in favor of Plaintiff and against Defendant Cabrera and

Defendant Firm in an amount not less than $400,000, representing the amount of the Court-

Ordered Escrow; (c) ordering the disgorgement of all compensation paid to Defendant Firm from

the Court-Ordered Escrow; and (d) awarding punitive damages against Defendant Cabrera and

Defendant Firm to punish and deter others from the wrongful conduct alleged herein."  (Compl.

¶ 150.)  Her malpractice claim (Count Seven, discussed further below) is also grounded in

Cabrera's disbursing the escrowed funds to the Firm and CityGrace in violation of the Sale

Order, which constituted, per O'Toole, a failure to "exercise the ordinary reasonable skill and

knowledge commonly possessed by a member of the legal profession" and caused damages of

37

$400,000.  (Compl. ¶¶ 185–87, 190.)  In Count Seven, O'Toole seeks an order "(a) adjudging

that Defendant Firm and Defendant Cabrera were negligent; (b) awarding damages in favor of

Plaintiff and against Defendant Cabrera in an amount not less than $400,000, representing the

amount of the Court-Ordered Escrow; and (c) ordering the disgorgement of all compensation

paid to Defendant Firm from the Court-Ordered Escrow."  (Compl. ¶ 191.)

It is true that the two claims are very similar, and that "when a plaintiff asserts both a

legal malpractice claim and a breach of fiduciary duty claim against an attorney, New York

courts typically dismiss the breach of fiduciary duty claim as duplicative of the malpractice

claim."  *Sheehy v. New Century Mortg. Corp.*, 690 F. Supp. 2d 51, 63 (E.D.N.Y. 2010).

However, this rule applies primarily in those kinds of cases where the breach of fiduciary duty

claim is based on the fiduciary duty attorneys owe their clients, as opposed to a distinct duty

arising from a separate relationship.  *See, e.g.*, *Ulico Casualty Co. v. Wilson, Elser, Moskowitz,

Edelman & Dicker*, 865 N.Y.S.2d 14, 20–21 (App. Div. 2008) ("Because the attorney-client

relationship is both contractual and inherently fiduciary, a complaint seeking damages alleged to

have been sustained by a plaintiff in the course of such a relationship will often advance one or

more causes of action based upon the attorney's breach of some contractual or fiduciary duty

owed to the client.  The courts normally treat the action as one for legal malpractice only.")

(collecting cases).  By contrast, "where a confidential relationship is not premised on the

attorney-client relationship, but arises out of a capacity or role that the defendant holds

regardless of the legal representation, non-malpractice claims cannot be said to duplicate the

malpractice claim."  *Amusement Indus., Inc. v. Buchanan Ingersoll & Rooney, P.C.*, No. 11 CIV.

4416 LAK, 2013 WL 628533, at *8 (S.D.N.Y. Feb. 15, 2013) (collecting cases).  In *Smartix Int'l

Corp. v. Garrubbo, Romankow & Capese, P.C.,* No. 06 CIV. 1501 (JGK), 2009 WL 857467, at

38

*10 (S.D.N.Y. Mar. 31, 2009), for example, the court permitted a breach of fiduciary duty claim to proceed, despite its factual similarities to a parallel legal malpractice claim, when the breach of fiduciary duty turned on the defendant's "membership on the plaintiff's board of directors and the fiduciary duty he owed the plaintiff in that capacity," as opposed to the legal malpractice claim, which was based on "alleged shortcomings in the legal services provided to the plaintiff." *Id.* Since the breach of fiduciary duty claim in that case was not premised on the fiduciary duty attorneys owe to their clients, but rather on a distinct fiduciary relationship, the court determined that the claims were not duplicative. Similarly, in *Cobalt Multifamily Investors I, LLC v. Shapiro*, No. 06 Civ. 6468 (KMW) (MHD), 2009 WL 2058530, at *2 (S.D.N.Y. July 15, 2009), the plaintiffs alleged malpractice and breach of fiduciary duty against an attorney who also acted as the trustee of a trust in which the plaintiffs had an interest. The breach of fiduciary duty claim was found not to be duplicative of the malpractice claim "given [the defendant]'s role as both counsel and trustee." *Id.* at *10 n. 21. And in *Amusement Industries*, the court allowed a fraud claim (which, like breach of fiduciary duty claims, are often dismissed when pleaded alongside legal malpractice claims) to proceed along with a legal malpractice claim, despite the factual similarities between the two, because the plaintiff grounded the fraud claim "in a factual scenario that [was] independent of any purported attorney-client relationship between plaintiff and the defendants." *Id.*, 2013 WL 628533 at *7. The court applied the same logic to a breach of fiduciary duty claim and refused to dismiss it as duplicative. *Id.* at *8.

Cabrera assumed two roles, that of Kaspar's counsel and that of escrow agent. He owed distinct duties to distinct parties in each of these roles. Moreover, the damages sought in Count Four, which include punitive damages, are not identical to the damages O'Toole seeks in Count

Seven.  For these reasons, the Court declines to dismiss Count Four as duplicative of Count

Seven.[13]

      Cabrera's motion for summary judgment on Count Four is **DENIED.**

      As for O'Toole's motion for summary judgment in her favor on Count Four, it is

**GRANTED** as it pertains to Cabrera's liability for breach of fiduciary duty, and **DENIED**

**WITHOUT PREJUDICE** as it pertains to damages.  Cabrera, acting as an escrow agent,

violated the terms of the escrow agreement contained in the Sale Order which he drafted and

understood.  As discussed above, this was a plain breach of his duties to Kaspar.  Cabrera has not

articulated a viable defense, and there are no genuine disputes of material fact.  The Court also

notes that Cabrera had no right to reimburse himself from the escrowed property: "Because of

the nature of the [fiduciary, escrow] relationship, the escrow agent has no lien upon the fund or

property in escrow to compensate him or her for services or expenses in connection with the

escrow."  *Nat'l Union Fire Ins. Co. Pittsburgh, Pa. v. Proskauer Rose Goetz & Mendelsohn*, 165

Misc. 2d 539, 544–45 (N.Y. Sup. Ct. 1994), *aff'd sub nom. Nat'l Union Fire Ins. Co. of*

*Pittsburgh, Pennsylvania v. Proskauer, Rose Goetz & Mendelsohn*, 227 A.D.2d 106 (NY. App.

Div. 1996).  O'Toole is entitled to judgment on the liability elements of her breach of fiduciary

duty claim.  But as discussed above, damages cannot be determined at this stage of the case.

---

[13]    Ideally, O'Toole would have pleaded Counts Four and Seven in the alternative.  *See Zhang v. Lau*, 210
A.D.3d 829, 831–32 (N.Y. App. Div. 2022) (permitting both breach of fiduciary duty and legal malpractice claims
against attorney who also served as escrow agent to proceed when one was pleaded in the alternative: "An escrow
agent has a duty not to deliver the escrow funds to anyone except upon strict compliance with the conditions
imposed . . . . [T]he complaint sufficiently pleaded the existence of an oral escrow agreement . . .  invoking fiduciary
duties even in the absence of an attorney-client relationship.  Therefore, . . . the breach of fiduciary duty cause of
action was properly pleaded in the alternative, in the event that it is ultimately determined that no attorney-client
relationship existed or that the . . . defendants' conduct related to the escrow funds was not within the scope of any
such relationship.").

### F.  Count Five: Aiding and Abetting Breach of Fiduciary Duty

O'Toole seeks summary judgment in her favor and against DeLibero and Kaspar on her

fifth claim, for aiding and abetting Cabrera's breach of fiduciary duty.  DeLibero cross-moved

for summary judgment on the same claim, and Kaspar filed a memorandum of law and an

affidavit in opposition to O'Toole's motion for summary judgment on this claim.

"One who aids and abets a breach of a fiduciary duty is liable for that breach as well,

even if he or she had no independent fiduciary obligation to the allegedly injured party, if the

alleged aider and abettor rendered 'substantial assistance' to the fiduciary in the course of

effecting the alleged breaches of duty." *Caprer v. Nussbaum*, 36 A.D.3d 176, 193 (N.Y. App.

Div. 2006) (internal citation omitted).  "[T]o adequately plead a claim of aiding and abetting a

breach of fiduciary duty under New York law, a plaintiff must allege: (1) breach of a fiduciary

duty owed to the plaintiff; (2) defendant's knowing participation in the breach; and (3)

damages." *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 460 (S.D.N.Y.

2007).  "'Although a plaintiff is not required to allege that the aider and abettor had an intent to

harm, there must be an allegation that such defendant had actual knowledge of the breach of

duty.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294 (2d Cir. 2006) (internal citation omitted).

In other words, the defendant must have known that a fiduciary responsibility was being

breached—not just that certain actions were being taken which ultimately constituted a breach of

fiduciary duty.  *See Mazzaro de Abreu v. Bank of Am. Corp.*, 525 F. Supp. 2d 381, 393–94

(S.D.N.Y. 2007) (dismissing aiding and abetting claim under New York law because plaintiff did

not establish that defendant knew of the fiduciary relationship at issue).  To have knowingly

participated in a breach of fiduciary duty, a defendant must have "provide[d] 'substantial

assistance' to the primary violator." *Kaufman v. Cohen*, 307 A.D.2d 113, 126 (N.Y. App. Div.

2003). "Substantial assistance may only be found where the alleged aider and abettor 'affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur . . . . The mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff.'" *Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 50 (2d Cir. 2005) (internal citation omitted). "Substantial assistance" also requires that the alleged aider and abettor "proximately caused the harm on which the primary liability is predicated" such that the plaintiff's injury was "a direct or reasonably foreseeable result of the conduct." *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 370–71 (S.D.N.Y. 2007) (internal citation omitted); *see also Sheehy v. New Century Mortg. Corp.*, 690 F. Supp. 2d 51, 70 (E.D.N.Y. 2010) (same).

O'Toole argues that Kaspar and DeLibero knowingly participated in Cabrera's dissipation of the escrowed property. (O'Toole SJ at 18.) There is no dispute over the fact that both knew exactly how the $400,000 was spent and assented to its distribution in violation of the Sale Order; they neither spent the money on remediation nor turned it over to the Trustee. (O'Toole SJ at 18.)

### 1. Kaspar

Kaspar's defense is that O'Toole cannot prove that Kaspar knowingly induced or participated in Cabrera's breach of fiduciary duty. (Kaspar Opp. at 6.) Kaspar claims that he hired Cabrera "based on Cabrera's experience and expertise in the area of bankruptcy law," that Kaspar "relied on Cabrera's advise [sic] with respect to the legal issues raised in the Complaint," and that Cabrera informed Kaspar that Kaspar would be "free to release" the escrowed funds once Kaspar's prior bankruptcy case was dismissed. (*Id.* at 6–7.) Kaspar seeks to undermine

O'Toole's scienter argument by bringing this advice-of-counsel defense.  O'Toole does not respond to this argument.

O'Toole's motion for summary judgment fails as against Kaspar for different reasons. The evidence thus far presented to the Court does not establish that Kaspar knew that Cabrera had a fiduciary responsibility which Kaspar then knowingly participated in breaching.  Indeed, Kaspar's defense could succeed—he may be able to establish at trial that he was unaware of Cabrera's fiduciary duties and that Cabrera dispelled any such idea he may have had.  For this reason, the Court **DENIES WITHOUT PREJUDICE** O'Toole's motion for summary judgment on Count Five as against Kaspar.  The factual issues will have to be fleshed out at trial.

2.  DeLibero

DeLibero similarly argues that she was advised by Cabrera "that if [the old bankruptcy case] was dismissed, she would be able to get her money back," and framed this as Cabrera "misinform[ing] her that he could release the funds to her upon dismissal."  (DeLibero O'Toole Opp. at 3.)  Therefore, DeLibero claims she did not know Cabrera was in breach of his fiduciary duties, and therefore should not be held liable for aiding and abetting.  (*Id.*)  She cross-moves for summary judgment, seeking to dismiss this Count against her.

O'Toole's motion for summary judgment as against DeLibero on Count Five fails for the same reason her motion against Kaspar on this Count failed: as of yet, there is insufficient evidence showing that DeLibero knew that Cabrera was breaching a fiduciary duty to Kaspar and that she knowingly participated in such a breach.  The Court will permit this Count against DeLibero to proceed to trial, as there is an open question of material fact on this point.  The Court accordingly **DENIES** both DeLibero's and O'Toole's motions for summary judgment on Count Five.

### G. Count Seven: Legal Malpractice

Count Seven is a legal malpractice claim against Cabrera and his Firm premised on Cabrera's violation of the Sale Order.  "To state a claim for legal malpractice under New York law, a plaintiff must allege: (1) attorney negligence; (2) which is the proximate cause of a loss; and (3) actual damages."  *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006).

Cabrera seeks to dismiss Count Seven.  He advances the same arguments against Count Seven that he used against Count Four: that Kaspar authorized the distributions, that Cabrera did not actually violate the Sale Order, and that Kaspar's estate did not suffer any damages.  All of these arguments fall flat.  The first—whether Kaspar authorized distributions—is an open question of fact, which must be determined at trial.  The second argument, that Cabrera did not in fact breach the Sale Order, fails for the reasons discussed above.  The third, the question of damages, is also an open question of fact.

Cabrera also argues in the alternative that, assuming there was damage to the estate, O'Toole cannot prove that his behavior proximately caused the damage, because it was Kaspar himself (and DeLibero) who spent the $400,000 inappropriately and not on remediation – it was their decision to misspend the funds that constituted a superseding/intervening cause of the damages.[14]  (Cabrera SJ at 14.)  "An attorney's conduct or inaction is the proximate cause of a plaintiff's damages if 'but for' the attorney's negligence the plaintiff . . . would not have sustained actual and ascertainable damages."  *Nomura Asset Cap. Corp. v. Cadwalader, Wickersham & Taft LLP*, 26 N.Y.3d 40, 50 (N.Y. App. Div. 2015) (cleaned up).  A superseding cause is "[a]n intervening act that the law considers sufficient to override the cause for which the

---

[14]     Once again, in making this argument, Cabrera ignores the fact that he had no right to any of the escrowed funds.

original tortfeasor was responsible, thereby exonerating that tortfeasor from liability." *Higazy v. Templeton*, 505 F.3d 161, 175 n.16 (2d Cir. 2007) (citing BLACK'S LAW DICTIONARY 213 (7th ed.1999)). "The superseding cause doctrine 'was intended to relieve a party of responsibility for injuries which he could not have foreseen and ultimately did not cause—injuries arising from a force or actor wholly outside of the circumstances of the original negligence.'" *In re Sept. 11 Litig.*, 621 F. Supp. 2d 131, 147 (S.D.N.Y. 2009) (*citing Rawl v. United States*, 778 F.2d 1009, 1016 (4th Cir.1985)). As the Court of Appeals of New York framed it,

> Where the acts of a third person intervene between the defendant's conduct and the plaintiff's injury, the causal connection is not automatically severed. In such a case, liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's negligence . . . . If the intervening act is extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from the defendant's conduct, it may well be a superseding act which breaks the causal nexus.

*Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 169–70 (N.Y. 1980).

DeLibero's and Kaspar's misuse of funds, which Cabrera should have known to disburse *only* in strict compliance with the Sale Order, was not a superseding cause of the type to relieve Cabrera of liability. The fact that these two individuals did not immediately sequester $400,000 for remediation upon receipt of the funds, but instead spent it on other expenses, was not "extraordinary," "not foreseeable," or "independent of or far removed from" Cabrera's conduct (Cabrera did, after all, directly enable this behavior).

Cabrera's motion for summary judgment on Count Seven is **DENIED.**

### H.  Count Eight: Avoidance and Recovery of Preferential Transfers under 11 U.S.C. §§ 547 & 550

Count Eight is a claim against the Firm for avoidance and recovery of preferential transfers under sections 547 and 550 of the Code. Section 547(b) of the Bankruptcy Code provides, in relevant part, that a trustee may avoid any "transfer of an interest of the debtor in

45

property": (1) made to or for the benefit of a creditor; (2) for or on account of an antecedent debt

owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4)

made on or within 90 days before the date of the filing of the petition (or one year, if the creditor

is an insider); and (5) that enables such creditor to receive more than it would have received if

the case were a chapter 7 liquidation case, the transfer had not been made, and the creditor

received payment of the debt to the extent provided by provisions under the Bankruptcy Code.

11 U.S.C. § 547(b).  Section 547(b)(4)(B) provides for avoidance of transfers within one year

before the date of filing if the creditor "at the time of such transfer was an insider."  (Whether the

transfers were to insiders or not is irrelevant here, as the transfers occurred within 90 days of

Kaspar's filing for bankruptcy a second time.)

Cabrera seeks summary judgment dismissing Count Eight, arguing that (1) the Trustee

lacks standing because the escrowed funds were not property of the estate, (2) it is duplicative of

the turnover claim, (3) the Debtor was solvent when the transfers were made, (4) the debt owed

to the Firm was incurred "in the ordinary course of business affairs," and (5) the transfer to the

Firm was not the result of a collusive effort to hinder, delay, or defraud creditors.  (Cabrera SJ at

18–19.)

"A preference action is designed to recover property that would have been available for

distribution to creditors but for the transfer . . . .  Accordingly, the scope of 'property of the

estate' in 11 U.S.C. § 541 determines the scope of property interests recoverable under section

547."  *Cassirer v. Herskowitz (In re Schick)*, 234 B.R. 337, 342 (Bankr. S.D.N.Y. 1999).  The

same analysis to determine whether the funds are property of the estate applies in the preference

claim as in the turnover claim.  As discussed *supra*, there is one scenario in which both legal and

equitable title to the escrowed funds might have resided in Kaspar just prior to the filing of the

present bankruptcy case, rendering the funds property of the estate: if the condition precedent to

proper distribution of the funds—DEC approval for a remediation plan—had not been met and

there was thus an "unsatisfied condition" and a "failure of purpose" of the escrow.  In such a

case, Kaspar *qua* grantor's reversionary equitable interest in at least a portion of the $400,000

vested by the time he filed for bankruptcy.  Unlike for turnover claims, there is no requirement in

preference actions that the amount sought via preference action be liquidated.  It is an open

question of fact whether the purpose of the escrow was frustrated and its conditions precedent

were ever met, meaning that there is a chance the Trustee can prove that escrowed funds

comprised part of the property of the estate.  For this reason, Cabrera's effort to dismiss Count

Eight with this argument fails.

Cabrera provides no caselaw in support of his claim that preference actions can be

duplicative of turnover actions, nor could this Court find any.  Moreover, as stated above, while

the Trustee can only seek turnover of liquidated amounts, preference actions have no such

requirement.  The Court will not dismiss Count Eight on this ground.

Whether the Debtor was solvent during the transfers is an open question of fact.  Neither

side has yet proffered evidence on this point.  The Court refuses to dismiss Count Eight based on

Cabrera's speculation about Kaspar's finances at the time of the transfer.

Cabrera's argument that the payment he made out to his own law firm from escrowed

funds was in the "ordinary course of business or financial affairs of the debtor and the transferee"

fails in the face of the facts.  The ordinary course of business defense generally protects

"recurring, customary credit transactions that are incurred and paid in the ordinary course of

business of the debtor and the debtor's transferee." *Official Comm. of Unsecured Creditors of*

*Enron Corp. v. Martin (In re Enron Creditors Recovery Corp.)*, 376 B.R. 442, 459 (Bankr.

S.D.N.Y. 2007) (internal citation omitted).  "The subjective ordinary-course defense asks whether the payments the debtor made to the creditor *during* the preference period are consistent with the parties' practice *before* the preference period."  *Ryniker v. Bravo Fabrics*, 643 B.R. 379, 383 (E.D.N.Y. 2022) (cleaned up) (emphasis in original).  The payment of fees in a bankruptcy case, even a case dismissed as occurred here, requires approval of the bankruptcy court, which here was neither sought nor received.  An application for approval of fees from funds deposited in escrow would have revealed to the Court and parties in the first case that Cabrera was violating the order he drafted that required the escrowed funds be held for remediation costs.  Cabrera's self-help was a brazen violation of the order that he drafted and which the Court approved.  Simply put, Cabrera's decision to take an apparently arbitrary amount of escrowed money set aside for remediation and pay himself with it is a far cry from an ordinary transaction.  Moreover, Cabrera has introduced no evidence to suggest that this is how he and Kaspar usually managed Cabrera's legal fees.  Cabrera's argument that the payment of his fees from the escrow account was an "ordinary course payment" is frivolous and baseless.

Cabrera may not have colluded with others to hinder, delay, or defraud Kaspar's creditors, but this is not an element of a preference claim which O'Toole must prove.

For the foregoing reasons, Cabrera's motion for summary judgment on Count Eight is

**DENIED.**

### I.  Count Ten: Avoidance and Recovery of Fraudulent Transfer under 11 U.S.C. §§ 548 & 550

In Count Ten, O'Toole seeks to avoid the CityGrace Transfer and recover the amount transferred to CityGrace plus interest on the theory that it is a fraudulent transfer under section 548(a)(1)(A) of the Code.  Section 548(a)(1)(A) allows the trustee to avoid "any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the

date of the filing of the [bankruptcy] petition, if the debtor voluntarily or involuntarily—(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted."

DeLibero seeks dismissal on two grounds: (1) the funds CityGrace received were "always her funds based on her interest in" the property sold which generated the cash, and (2) the funds "were not and are not property of the estate as she never filed for bankruptcy."[15]  (DeLibero O'Toole SJ at 7.)  The record presently before the Court is clear: DeLibero understood that $400,000 was set aside in escrow for the sole purpose of remediation.  While she may have had a contingent remainder interest in 50% of whatever funds may have remained after remediation had been fully paid for out of the escrow account, she had no right to any greater piece of the $400,000, and certainly had no right to lay claim to it before remediation was paid for.  The escrowed funds CityGrace received were *not* "always [DeLibero's] funds."  Moreover, as detailed above, it is an open question of fact as to whether the escrowed funds could be property of the Debtor's estate.  DeLibero's defenses fail.

DeLibero's motion for summary judgment on Count Ten is **DENIED.**

### J.   Count Eleven: Avoidance and Recovery of Fraudulent Transfer under New York Debtor Creditor Law 273(a)(1)

O'Toole also brings a claim against CityGrace pursuant to New York Debtor Creditor Law ("DCL") 273(a)(1).  Under section 273(a)(1), a "transfer made or obligation incurred by a debtor is voidable as to a creditor . . . if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay or defraud any creditor of the debtor."  Under section

---

[15]     DeLibero seems to misunderstand the concept of trustee standing and the relevant property of the estate. The Court will read her argument generously to parallel Cabrera's—that the escrowed funds were not property of *Kaspar's* estate.

544(b) of the Code, the Trustee may assert a claim under state fraudulent transfer law if there is an unsecured creditor who could pursue the action.

DeLibero moved to dismiss Count Eleven on the same grounds as she moved on Count Ten. Her two arguments fail for the same reasons as discussed above. DeLibero's motion for summary judgment on Count Eleven is **DENIED**.

### K. Count Twelve: Avoidance and Recovery of Fraudulent Transfer under New York Debtor Creditor Law 273(a)(2)

Count Twelve is a claim against CityGrace under New York Debtor Creditor Law 273(a)(2). Under section 273(a)(2), "transfer made or obligation incurred by a debtor is voidable as to a creditor . . . if the debtor made the transfer or incurred the obligation . . . (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."

DeLibero moved to dismiss Count Twelve on the same grounds as she moved on Count Ten. Her two arguments fail for the same reasons as stated above. DeLibero's motion for summary judgment on Count Eleven is **DENIED**.

### L. Count Thirteen: Avoidance and Recovery of Preferential Transfer under 11 U.S.C. §§ 547 & 550

O'Toole brings this claim based on section 547 of the Code against CityGrace in the alternative, "[t]o the extent the CityGrace Transfer was made on account of an antecedent debt." (Compl. ¶ 248.) Section 547(b) of the Bankruptcy Code provides, in relevant part, that a trustee may avoid any "transfer of an interest of the debtor in property": (1) made to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer

was made; (3) made while the debtor was insolvent; (4) made on or within 90 days before the

date of the filing of the petition (or one year, if the creditor is an insider); and (5) that enables

such creditor to receive more than it would have received if the case were a chapter 7 liquidation

case, the transfer had not been made, and the creditor received payment of the debt to the extent

provided by provisions under the Bankruptcy Code.  11 U.S.C. § 547(b).  Section 547(b)(4)(B)

provides for avoidance of transfers within one year before the date of filing if the creditor "at the

time of such transfer was an insider."  (Whether the transfers were to insiders or not is irrelevant

here, as the CityGrace Transfer occurred within the 90 days prior to Kaspar's filing for

bankruptcy a second time.)

  CityGrace objects to this claim because it requires the escrow to be property of the

estate.  As discussed above, O'Toole may be able to prove at trial that the escrowed funds were

property of the estate.  Accordingly, CityGrace's motion for summary judgment on Count

Thirteen is **DENIED.**

### M. Count Fourteen: Monies Had and Received

Count Fourteen is against the Firm.  The elements of money had and received under New

York law are: "(1) the defendant received money belonging to the plaintiff, (2) the defendant

benefitted from receipt of the money, and (3) under principles of equity and good conscience, the

defendant should not be permitted to keep the money." *Lebovits v. Bassman*, 120 A.D.3d 1198,

1199 (N.Y. App. Div. 2014) (internal citation omitted).

Cabrera seeks to dismiss Count Fourteen, arguing that it depends on a finding that the

escrowed funds are property of the estate (which he claims is not the case), that the count is

duplicative of the turnover claim, and that the count fails as a matter of law because there is no

evidence that the transfers to the Firm were made "through the medium of oppression, imposition, extortion, or deceit."  (Cabrera SJ at 19–20.)

As explained above, O'Toole will have an opportunity to prove at trial that the escrowed funds are property of the estate.

Cabrera provides no caselaw to support his duplicativeness argument, and this Court could find no instance of a court in this circuit dismissing a monies had and received claim on the grounds that it replicated a turnover claim.  Moreover, the two counts seek different amounts of damages: Count Two seeks the turnover of the entirety of the escrowed funds, whereas Count Fourteen seeks recovery only of the Firm Transfer plus interest.

Finally, O'Toole will not be required to prove that the Firm obtained the money "through the medium of oppression, imposition, extortion, or deceit."  While this is one way to prove the claim, it is not the only way.  *See, e.g.*, *Klein v. Frenkel*, No. 14CV2719ADSAYS, 2017 WL 2371173, at *5 (E.D.N.Y. May 30, 2017) ("As to the money had and received claim, traditionally, the remedy for money had and received is available if one man has obtained money from another, through the medium of oppression, imposition, extortion, or deceit, or by the commission of a trespass . . . .  Instances where plaintiffs have prevailed include where plaintiff has paid money by mistake, money has been collected for an illegal tax or assessment, or property is erroneously taken or withheld by a public official.") (cleaned up).  It is not an essential element of the claim.

Cabrera's summary judgment motion on Count Fourteen is **DENIED**.

### N.  Count Fifteen: Monies Had and Received

Count Fifteen parallels Count Fourteen, save for the fact that it is brought by O'Toole against CityGrace.  CityGrace objects, complaining that Count Fifteen "states no cognizable

theory for relief and just repeats that DeLibero received a portion of fund from escrow without acknowledging that the portion of the funds deposited in the escrow belonged to DeLibero." (DeLibero SJ at 9.)  O'Toole alleged sufficient facts to support a claim for monies had and received against CityGrace (see *supra* for the legal standard).  DeLibero's argument that the money in escrow belonged to her fails for the reasons discussed earlier.  Accordingly, CityGrace's motion for summary judgment on Count Fifteen is **DENIED**.

### O. Count Sixteen: Unjust Enrichment

Count Sixteen is a claim against CityGrace for unjust enrichment based on the CityGrace Transfer.  CityGrace objects on the basis that "DeLibero received nothing more than a return of her own funds and was therefore neither enriched justly nor unjustly." (*Id.*)  As explained in the discussion for Count Ten, this argument is flawed.  Accordingly, CityGrace's motion for summary judgment on Count Sixteen is **DENIED**.

### P. Count I: Injunctive Relief

In Count I, O'Toole seeks a preliminary and permanent injunction barring Cabrera, the Firm, CityGrace, and DeLibero from "transferring, hypothecating, encumbering or otherwise disposing of" the formerly escrowed money funneled to them.  (Compl. ¶¶ 115, 118.)  She grounds her request in section 105 of the Code, Rule 7065 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), and Rule 65 of the Federal Rules of Civil Procedure, which she claims allows the Court to "enjoin a party from proceeding with or continuing with, a course of conduct or practice which repletes, diminishes and/or affects property and/or diminishes the value of those assets or impairs Plaintiff's recovery efforts." (Complaint ¶ 116.)  Cabrera and DeLibero seek to dismiss this Count.

Bankruptcy Rule 7065 makes FRCP Rule 65 applicable in adversary proceedings, with one modification: "on application of a . . . trustee . . . the court may issue a temporary restraining order or preliminary injunction without complying with subdivision (c) of that rule."  A party seeking a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd*., 598 F.3d 30, 35 (2d Cir. 2010) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc*., 596 F.2d 70, 72 (2d Cir. 1979)).  And for O'Toole to win a permanent injunction, she must show "(1) that [Kaspar's estate] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C*., 547 U.S. 388, 391 (2006).

Additionally, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title" pursuant to section 105(a) of the Bankruptcy Code.  11 U.S.C. § 105(a).  The Second Circuit has held that there is statutory authority under section 105(a) to enjoin the pursuit by creditors of actions that a bankruptcy estate has the exclusive right to pursue.  *See Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*, 740 F.3d 81, 87–93 (2d Cir. 2014).  Section 105(a) may also be used to "enjoin proceedings in other courts when it is satisfied that such a proceeding would defeat or impair its jurisdiction with respect to a case before it."  *Johns–Manville Corp. v. Colorado Ins. Guar. Assoc. (In re Johns–*

*Manville Corp.)*, 91 B.R. 225, 228 (Bankr. S.D.N.Y. 1988) (internal citation omitted). To the extent that the irreparable harm requirement has not been satisfied in these cases, such cases have held the requirement unnecessary. *See Sec. Inv'r Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 429 B.R. 423, 436 (Bankr. S.D.N.Y. 2010) ("Because injunctions under section 105(a) are authorized by statute, they need not comply with the traditional requirements of Rule 65."); *McHale v. Alvarez (In re The 1031 Tax Group, LLC)*, 397 B.R. 670, 674 (Bankr. S.D.N.Y. 2008) ("Because § 105(a) injunctions are authorized by statute, they do not need to comply with the traditional requirements of FED. R. CIV. P. 65 . . . . Rather, 'the bankruptcy court may enjoin proceedings in other courts when it is satisfied that such a proceeding would defeat or impair its jurisdiction with respect to a case before it.'") (internal citation omitted).

The Court finds that O'Toole has not established grounds for injunctive relief, though not for the reasons Cabrera identifies (which are the same arguments he levied against the turnover and breach of fiduciary duty claims). First, Section 105(a) does not provide the Court with grounds to grant an injunction in this case, as the Trustee is not seeking to enjoin proceedings in other courts which may interfere with this Court's work in this case or the underlying bankruptcy. Rather, the Trustee seeks to enjoin the defendants from spending or hiding that money which has likely already been spent. This request falls outside of the scope of section 105(a) injunctions. Second, any injury compensable through monetary damages is inherently *not* irreparable. *See Mullins v. City of New York*, 634 F. Supp. 2d 373, 386–87 (S.D.N.Y. 2009), *aff'd*, 626 F.3d 47 (2d Cir. 2010) ("[I]rreparable harm by definition cannot be remedied by an award of monetary damages.") (cleaned up). The award O'Toole seeks is of monetary damages; she seeks to prevent the defendants from spending money (which they likely have already spent). There is no harm to the Debtor's estate which cannot be compensated with cash.

Accordingly, Cabrera's and DeLibero's motions on Count I are **GRANTED**, and Count I is **DISMISSED**.

### Q. DeLibero's Crossclaims Against Cabrera

DeLibero and Cabrera both move for summary judgment on DeLibero's crossclaims against Cabrera. DeLibero sued Cabrera for negligence as escrow agent and for legal malpractice. For the reasons discussed below, DeLibero's claims are **DISMISSED**.

### 1. Negligence/Breach of Fiduciary Duty

Cabrera, as escrow agent, owed fiduciary duties to all those with interests in the escrow account. *Lin v. Lau*, 210 A.D.3d 817, 819 (N.Y. App. Div. 2022) ("An attorney holding funds in escrow owes a fiduciary duty to anyone with a beneficial interest in the trust.") (internal citation omitted). DeLibero was one such person, as she had an interest in 50% of the funds that would have remained after the escrowed funds had been used for remediation (had they been used properly). DeLibero argues that Cabrera behaved negligently when he disbursed the funds in violation of the Sale Order, and so, "[t]o the extent that Defendants received any monies improperly from the escrow the liability lies solely with" Cabrera. (DeLibero Cabrera SJ at 1.) All of the cases DeLibero cites concern fiduciary duties owed by escrow agents, and this Court will read her negligence claim to be one for breach of fiduciary duty.

As previously stated, under New York law, "[t]o state a cause of action to recover damages for breach of fiduciary duty, a plaintiff must allege: '(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct.'" *Raia*, 942 N.Y.S.2d at 545 (internal citation omitted). Cabrera owed DeLibero the same duty he owed Kaspar; by violating the Sale Order, he breached that duty to both. The differentiating factor here is that DeLibero does not articulate *any* theory of damages,

nor can Cabrera's behavior be said to have caused her harm.  DeLibero received far more from Cabrera's malfeasance than she likely would have received had Cabrera complied with the terms of the Sale Order.  Therefore, DeLibero did not suffer damages as a direct consequence of Cabrera's breach of duty, and her claim fails.

The Court notes that Cabrera incorporates all of his arguments against O'Toole into his opposition to DeLibero's motion (Cabrera Opp. at 22–24).  It is not clear exactly which arguments he wishes to rely on to rebut DeLibero's crossclaim, as not all can apply to this claim (*e.g.*, Cabrera's argument that Kaspar directed him to release the funds is irrelevant, as is his claim that the escrowed funds are not property of the estate).  However, just as Cabrera's arguments against O'Toole's claims fail, so do they here, for the reasons discussed above.

### 2.  Legal Malpractice

DeLibero asserts that there was an attorney-client relationship between her and Cabrera, based on Cabrera's ongoing representation of DeLibero in an unrelated matter at the time of the transfers out of the escrow account and what DeLibero believes was Cabrera's express undertaking to move money out of the escrow account for her (which DeLibero claims Cabrera did in his capacity as *her* lawyer).  She points to Cabrera's deposition testimony, during which he stated that DeLibero was *not* his client during Kaspar's bankruptcy, but that she "was a client of the firm on another matter" involving a "code violation from the Town of Putnam."  (Cabrera Dep. Tr. 59:23–60:14.)

"The existence of an attorney-client relationship is an essential element of a cause of action to recover damages for legal malpractice."  *Zhang v. Lau*, 210 A.D.3d 829, 830 (N.Y. App. Div. 2022).  In New York, "[a]n attorney-client relationship may exist in the absence of a retainer or fee . . . .  However, a party's unilateral belief does not confer upon him or her the

status of client.  Rather, to establish an attorney-client relationship, there must be an explicit

undertaking to perform a specific task." *Willoughby Rehab. & Health Care Ctr., LLC v.

Webster*, 190 A.D.3d 887, 889 (N.Y. App. Div. 2021) (internal citations omitted).

Cabrera objects to the legal malpractice claim, arguing that it is not supported by

competent evidence and that DeLibero herself knew that there was no attorney-client relationship

between herself and Cabrera during the transfers.  He points to DeLibero's deposition transcript,

during which she states that she had "nothing to do with Matt Cabrera regarding [Kaspar's]

bankruptcy."  (DeLibero Dep. Tr. 29:13–30:16.)  When asked if Cabrera represented her in any

capacity, she stated: "it was an attorney in his office that was representing me [DeLibero]

individually because I [was] being sued by . . . the Town of Putnam Valley . . . .  This is years

ago.  And so this attorney from . . . his [Cabrera's] office represented me" in the case involving

the town.  (*Id*. 66:14–23.)  When asked if, apart from that one case, Cabrera or any of his

associates represented DeLibero "in any other capacity," she said, "I don't believe so, no."  (*Id.*

66:24–678:2.)  Her deposition testimony accords with Cabrera's and undermines her argument

that Cabrera was her lawyer in any relevant respect.  Moreover, DeLibero had retained a

different lawyer, Frank DeEsso, to assist with the sale of the property that generated the funds in

escrow.  (*Id*. 23:13–15.)  She drew a distinction between DeEsso and Cabrera, testifying that

"[a]ll instructions . . . came from Matt Cabrera as to what needed to be done.  So Matt Cabrera is

the person who insisted on $400,000 being put into an escrow account and directed *my attorney* .

. . to work on my behalf."  (*Id.* 29:19–30:4 (emphasis added).)  DeLibero repeatedly stated in

sworn deposition testimony that Cabrera was not her attorney.  She cannot now go back on those

assertions, especially when she cannot point to contrary evidence.

DeLibero's claims against Cabrera for breach of fiduciary duty and legal malpractice are

**DISMISSED**.

### R.  Cabrera Must Disgorge $120,000

As discussed above, Cabrera violated the Sale Order in deciding to pay himself a total of

$120,000[16] out of the $400,000 set aside in escrow for remediation of the Cimarron Ranch—

money to which he had no right.  In so doing, he claims he was taking his just compensation for

work performed for Kaspar during Kaspar's first bankruptcy.

Cabrera never sought final approval for his fees from this Court, even though he could

(and should) have—bankruptcy courts retain jurisdiction over fee applications after a case has

been dismissed.  *In re Parklex Assocs., Inc.*, 435 B.R. 195, 208 (Bankr. S.D.N.Y. 2010).  The

Code (notably section 330) and the Federal Rules of Bankruptcy Procedure very clearly set out a

detailed review process for fees to professional persons retained under section 372 of the Code.

When attorneys do not seek approval of fees, the Court has the power to deny them payment.

*See Dery v. Cumberland Cas. & Sur. Co. (In re 5900 Assocs. Inc.)*, 468 F.3d 326, 331 (6th Cir.

2006) ("As an attorney appointed under 11 U.S.C. § 327, [the attorney] was required to seek

approval of his fees from the court under 11 U.S.C. § 330.  Because he did not do so, his fees

[from prior bankruptcy] are unenforceable."); *In re Jeanes*, No. 01–00760, 2004 WL 1718093, at

*2 (Bankr. N.D. Iowa June 17, 2004) ("Because § 330(a) requires court approval to create the

obligation to pay the attorney's fees, absent court approval neither the debtor nor the estate is

ever liable.  Court approval under § 330(a) is what creates the liability, not the performance of

the services.") (internal citations omitted); *In re Marin*, 256 B.R. 503, 507 (Bankr. D. Colo.

2000) ("*There is no other way for an attorney to be paid!*  An attorney who extracts payments

---

[16]    For the work performed for Kaspar in his first Chapter 11 proceeding.  He also paid himself $4,500 out of
the escrow account for unrelated work his firm performed for DeLibero.  *See supra.*

59

from debtors other than pursuant to proper disclosure, or to allowance under section 330, stands

in violation of the provisions of the Bankruptcy Code, and may properly be stripped of all fees.")

(emphasis in original)).

Cabrera avoided having his fee payments scrutinized by the Court through his illicit self-

help scheme.  This is tantamount to a failure to disclose his compensation and a violation of his

disclosure obligations under section 329 of the Code.  Section 329 provides:

> (a) Any attorney representing a debtor in a case under this title, or in connection with
> such a case, whether or not such attorney applies for compensation under this title,
> shall file with the court a statement of the compensation paid or agreed to be paid,
> if such payment or agreement was made after one year before the date of the filing
> of the petition, for services rendered or to be rendered in contemplation of or in
> connection with the case by such attorney, and the source of such compensation.
> (b) If such compensation exceeds the reasonable value of any such services, the court
> may cancel any such agreement, or order the return of any such payment, to the
> extent excessive, to—
>> (1) the estate, if the property transferred—
>>> (A) would have been property of the estate; or
>>> (B) was to be paid by or on behalf of the debtor under a plan under
>>> chapter 11, 12 or 13 of this title; or
>> (2) the entity that made such payment.

11 U.S.C. § 329.  "The disclosure requirements imposed by section 329 are mandatory, not

permissive."  *In re Sandpoint Cattle Co., LLC*, 556 B.R. 408, 421 (Bankr. D. Neb. 2016).

"'Debtor's counsel must lay bare all its dealings . . . regarding compensation . . . Counsel's fee

revelations must be direct and comprehensive.  Coy, or incomplete disclosures . . . are not

sufficient.'"  *Jensen v. U.S. Trustee (In re Smitty's Truck Stop, Inc.)*, 210 B.R. 844, 848 (B.A.P.

10th Cir. 1997).  "The Code and Rules require, without exception, that the amount and source of

the compensation be disclosed."  *Schroeder v. Rouse (In re Redding)*, 263 B.R. 874, 878 (B.A.P.

8th Cir. 2001).

In failing to file a final fee application and to disclose to the Court that he had paid

himself $120,000 from the escrow account for the work he did for Kaspar's first bankruptcy

proceeding, Cabrera breached his duties as a retained professional under the Code.  The law is

clear: he needed to disclose this payment.  This is sanctionable behavior.

"A bankruptcy court confronted with a professional's violation of the Code and/or Rules

[including sections 327, 329 and 330] is afforded a great deal of latitude in fashioning an

appropriate sanction."  *In re Parklex Assocs., Inc*., 435 B.R. at 207 (cleaned up).  "The

provisions of the Bankruptcy Code and the Bankruptcy Rules that regulate attorney fees are

designed to protect both creditors and the debtor against overreaching attorneys . . . .  To ensure

such protection, bankruptcy courts have broad and inherent authority to deny any and all

compensation where an attorney fails to satisfy the requirements of the Code and Rules."

*Henderson v. Kisseberth (In re Kisseberth)*, 273 F.3d 714, 721 (6th Cir. 2001) (citations

omitted).  "When an attorney unilaterally elects to conceal the existence of payments that might

otherwise be subject to examination by creditors and the court, the entire compensation review

process is derailed and public confidence in the system is damaged.  The failure to disclose is a

breach of the duty of candor to the tribunal.  It implicates Bankruptcy Rule 9011.  Because of the

importance of this process, a bankruptcy court retains the power, authority, and duty to police the

disclosure and reporting requirements set forth in the Bankruptcy Code and Rules with its

sanctioning powers, including the power to order the disgorgement of all sums received by

counsel and the forfeiture of all compensation paid to counsel in a particular case."  *In re Fair*,

No. 15-33400-SGJ-13, 2016 WL 3027264, at *13 (Bankr. N.D. Tex. May 18, 2016).  "It is well

settled that disgorgement of fees is an appropriate sanction for failure to comply with the

disclosure requirements of section 329 and Rule 2016.  Indeed, the Courts of Appeal which have

addressed this and similar disclosure issues are emphatic in affirming the grant of sanctions."  *In

re Redding*, 263 B.R. at 880; *see also In re Gorski*, 519 B.R. 67, 73 (Bankr. S.D.N.Y. 2014) ("In

cases involving an attorney's failure to disclose his fee arrangement under § 329 or Rule 2016, however, the courts have consistently denied all fees.") (internal citation omitted); *In re Nunez*, 598 B.R. 696, 708 (Bankr. E.D.N.Y. 2019) ("Failure to file the disclosures mandated by § 329(a) and Bankruptcy Rule 2016(b) is grounds to deny all fees and costs sought by counsel."). The decision to reduce fees, deny fees or order disgorgement of fees under section 329 is within the sound discretion of the bankruptcy court. *Davis v. Hibbits (In re Sullivan's Jewelry, Inc.)*, 226 B.R. 624, 627 (8th Cir. BAP 1998).

In light of the clear caselaw and Cabrera's disregard for the clear language of the Code, the Court **ORDERS** Cabrera and his Firm to disgorge to the Trustee $120,000 of the money he took from the Court-ordered escrow account.

## IV.    CONCLUSION

For the foregoing reasons, O'Toole's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. Cabrera's motion is **GRANTED IN PART** and **DENIED IN PART**. DeLibero's motions are **GRANTED IN PART** and **DENIED IN PART**. A separate order will be entered scheduling a case management conference in the main case and the adversary proceeding.

Dated:    February 18, 2025
          New York, New York

        *Martin Glenn*
        MARTIN GLENN
        Chief United States Bankruptcy Judge